ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| M. H. YACHT SALES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. CV403-115 |
| | ) | |
| PALMER JOHNSON SAVANNAH, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Defendant Palmer Johnson Savannah, LLC files this response in opposition to plaintiff's Motion for Preliminary Injunction. [Doc. 6]. Defendant files this response subject to, and without waiving, its pending motion to dismiss the case for lack of an indispensable party. [Doc. 12]. As part of its opposition to plaintiff's motion for a preliminary injunction, defendant attaches the Affidavit of M. Gregg ("Skip") Robinson as Exhibit A and the Affidavit of J. Wiley Ellis as Exhibit B. Defendant urges the Court to deny the Motion for Preliminary Injunction and submits the following memorandum of law in support of its position.

## INTRODUCTION

Plaintiff seeks injunctive relief that would thrust this Court into the position of taking over the safekeeping of a motor yacht that is not threatened with harm. As is shown by the attached affidavit of defendant's Vice President, M. Gregg ("Skip") Robinson, there is no factual basis to support plaintiff's incorrect and unfounded

contentions that the boat "is in danger of being destroyed" and "is in immediate danger of becoming a total loss."  [Doc. 7, p. 1].

Plaintiff seeks a declaratory judgment that defendant assumed a contract between plaintiff and a non-party, Palmer Johnson Savannah, Inc., to complete the construction of plaintiff's motor yacht, the *Ionian Princess*.  The vessel has been at the Palmer Johnson shipyard in Thunderbolt since 2001.  Work on the boat was stopped several months ago when plaintiff refused to pay for work that defendant had performed as a subcontractor to Palmer Johnson Savannah, Inc.  Nonetheless, the security measures and circumstances relating to the safekeeping of the boat are essentially unchanged from those employed at the shipyard since 2001.

## STATEMENT OF FACTS

Defendant vigorously disputes plaintiff's statement of facts.  As shown below, the vessel has not deteriorated, is not in danger of being "completely lost," and is not exposed to any irreparable harm.  Defendant's untrue and unfounded contentions fall into several categories, which defendant will address individually.

A.    REMOVAL OF TOOLS.

Plaintiff complains that defendant has removed defendant's tools and equipment from the boat.  Because defendant has not performed any work on the boat for several months, it is unnecessary for defendant to keep tools on the vessel.   The removal of the tools has not even arguably caused any danger or harm to the boat. [Robinson Affidavit hereto, ¶ 10].

B.     POTENTIAL FOR WATER DAMAGE.

Contrary to the flat misstatement in the affidavit of plaintiff's captain, in which he said "there are no windows or hatches on the *Ionian Princess,"* [Doc. 7, Vernicos Affidavit, ¶ 7], many of the vessel's windows and all of its portholes are in place. [Robinson Affidavit hereto, ¶ 8.b.].   Moreover, any windows that have not yet been glassed are covered by form-fitting plywood shields.  [Robinson Affidavit hereto, ¶ 8.b and photos that are RobinsonAffidavit Exhibits 7.e, 7.g, 7.j, 7.m, 7.n through 7.p, and 7.x through 7.aa].

Although not confirmed by Captain Vernicos' affidavit, plaintiff makes the unfounded contention in its brief that the vessel "has gaping holes in its structure" where other parts are to be installed.  [Doc. 7, p. 3].  There are a few small, design holes in the hull [*see* Photos 7.d and 7.g through 7.h, which are exhibits to the Robinson Affidavit hereto] through which equipment such as propeller shafts and rudder posts will be inserted when the vessel is prepared for launching.  [Robinson Affidavit hereto, ¶ 8.a., 14].  These openings are mostly on the bottom of the hull and do not expose the vessel to damage from the elements.  These small openings have been present in the vessel since the boat was moved onto the yard.   Moreover, contrary to the statement of Captain Vernicos that "rain is getting inside the vessel and into the electrical wiring," [Doc. 7, Vernicos Affidavit, ¶ 7], no such thing is happening.  [Robinson Affidavit hereto, ¶ 8.c].

Although not required by the contract between plaintiff and Palmer Johnson Savannah, Inc., a large plastic tarpaulin covers the vessel.   Robinson Affidavit hereto, ¶ 7.a.].  The tarpaulin is rigged over a large scaffold frame which is sufficiently

anchored.  There are no holes in the tarpaulin.   For a very brief period of time, a seam of the tarpaulin separated, allowing a small gap that measured approximately one inch by four feet.  The seam has been repaired and there are no holes in the tarpaulin. [Robinson Affidavit hereto, ¶ 8.b. and Photo Exhibits 7.a-7.b, 7.f, 7.q, 7.s, 7.t and 7.ee].

     C.     PREMISES SECURITY.

Plaintiff argues that the Thunderbolt premises are in danger of vandalism [Doc. 7, pp. 5-6].  There is no merit to this argument.   The only access to the premises by land is through a security gate off River Drive, which is manned twenty-four hours a day by a private security agency in the same manner in which it has been manned since the vessel arrived in Thunderbolt in 2001.  [Robinson Affidavit, ¶ 11].  Like every boatyard and marina, the yard could be accessed by boat but such access does not create a substantial likelihood of vandalism at Palmer Johnson any more than at any other shipyard, marina or private dock.   The manner in which security is provided to the Thunderbolt facility has not been changed since defendant purchased the assets of Palmer Johnson Savannah, Inc. [Robinson Affidavit, ¶ 11].

Plaintiff makes the unfounded contention that the Thunderbolt facility has been "abandoned." [Doc. 7, p. 10].  In actuality, the Thunderbolt facility is a working boat repair facility where thirty-five to fifty employees of defendant work five and a half days a week.  At the present time, defendant is performing work at the Thunderbolt facility on seven large boats (more than 100 feet in length) and numerous other boats having an estimated commercial value of approximately $75 million. [Robinson Affidavit, ¶ 11]. Plaintiff's allegations that the premises have been abandoned and are insecure are simply untrue.

D.    AIR CONDITIONING/VENTILATION.

Defendant has consistently taken adequate steps to ventilate the vessel. A venting system of air-carrying tubing has been hooked up to vessel since work was stopped several months ago [Photo Exhibit 7.I to Robinson Affidavit], and defendant has periodically connected air conditioners to this venting system to provide climate control to the vessel.  Robinson Affidavit hereto, ¶ 9].  At the present time, an air conditioning system is running on the vessel twenty-four hours a day, even though Mr. Robinson, who has worked in the boat construction industry for thirty-five years, does not believe such continuous air conditioning is necessary for the proper maintenance of the boat. [Robinson Affidavit hereto, ¶ 9].  There is no evidence of any moisture on the boat or of any deterioration of the materials on it, and the boat has never been in any danger of being damaged by mold, mildew or moisture. [Robinson Affidavit hereto, ¶ 9].

E.    BULKHEAD FAILURE.

Plaintiff contends the boat is jeopardized by the partial failure of a bulkhead at the river's edge.  [Doc. 7, p. 6; Vernicos Affidavit, ¶ 10].  This condition does not threaten the location where the vessel sets. That location is at least sixty feet away from the failed bulkhead.  [Robinson Affidavit hereto, ¶ 13]. The vessels sets on a concrete platform supported not merely by the earth beneath it but by its own independent pilings. {Robinson Affidavit hereto, ¶ 13].  Moreover, the exposed gas line that resulted from the bulkhead failure, which is mentioned in paragraph 10 of Captain Vernicos' affidavit, was repaired within a few hours of the time when the partial bulkhead failure occurred more than a month ago. [Robinson Affidavit hereto, ¶ 13].

There is no evidence of any continuing degradation of the area where the bulkhead failed. [*Id.*].

      F.     PLAINTIFF IS NOT POWERLESS TO PREVENT THE ALLEGED HARM.

Plaintiff contends the vessel "cannot be moved because it is not seaworthy" and because there is "no access to the machinery necessary to launch ships." Plaintiff contends the vessel is thus stranded at its present location and that plaintiff is "powerless [to remove the vessel] to prevent the harm that will be inflicted" on it. [Doc. 7, p. 6]. These contentions are meritless. Even before Palmer Johnson Savannah, Inc. began working on the vessel in 2001, the vessel was partially constructed and was sufficiently seaworthy to be towed. The partial construction was performed outside of Georgia and the vessel was then towed to Savannah in 2001 from Port Everglades, Florida, near Fort Lauderdale. [Robinson Affidavit hereto, ¶ 14].

The vessel could be towed from defendant's facility at Thunderbolt and should be removed if plaintiff is not going to enter into a new contract with defendant for defendant to continue the work started by Palmer Johnson Savannah, Inc. The vessel could be made seaworthy for the move by plugging the shaft logs, rudder ports and several through-hulls located below the waterline of the vessel, which could take approximately two days. Robinson Affidavit hereto, ¶ 14. The vessel would then be launched in the normal fashion into the Wilmington River just as it was hauled from the river, a process through which house-movers would jack up the cradling, slide the vessel laterally to a transfer table, and then slide the vessel to the elevator from where it would be launched. [Robinson Affidavit hereto, ¶ 14]. If plaintiff were truly concerned

about the safety and security of the vessel, plaintiff would undertake these procedures and tow it to a shipyard where plaintiff would feel more comfortable.

### G.   STORAGE CONTAINER.

Plaintiff contends defendant broke into its locked storage container and stole plaintiff's property. [Doc. 7, Vernicos Affidavit, ¶ 11]. The actual facts are set forth in paragraph 15 of Mr. Robinson's affidavit.  On May 5, 2003, in the presence of Captain Vernicos, defendant entered into plaintiff's storage trailer by using a key that had been left with defendant. With Captain Vernicos' knowledge, defendant removed four inexpensive copper-nickel fittings that had a total wholesale value of less than $25. These items were used to fill an immediate need on another vessel. Defendant explained to Captain Vernicos that either the items would be replaced or their value would be credited to plaintiff's account.  This procedure was a normal practice at the shipyard. [Robinson Affidavit hereto, ¶ 15].

ARGUMENT AND CITATIONS OF AUTHORITY

A preliminary injunction is a "drastic" remedy that should not be granted unless the movant "clearly carries the burden of persuasion." *Bank Leumi-Le-Isreal, B.M. v. Sunbelt Indus., Inc.,* 485 F. Supp. 556, 559 (S.D. Ga. 1980), *quoting Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974).  Under its burden, plaintiff must prove "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the

- 7 -

defendant, and (4) that granting the injunction would not disserve the public interest."

*American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir.

1998)(emphasis added).  The grant of a preliminary injunction is not the rule but the

exception.  *Robbins v. Ong*, 452 F. Supp. 110, 117 (S.D. Ga. 1978).  Plaintiff cannot

carry its burden of clearly showing the required elements of a preliminary injunction.

I.     DEFENDANT IS NOT CAUSING IRREPARABLE HARM TO PLAINTIFF.

The foregoing Statement of Facts demonstrates that the vessel is safe and

secure.  It is not in danger of rain, mold, moisture, theft, vandalism, cave-ins, or any

other hazards plaintiff might urge.  The professional and businesslike manner in which

defendant is dealing with the vessel is aptly illustrated by correspondence Mr. Robinson

sent to plaintiff's Captain Vernicos as recently as May 29 and June 20, 2003.

[Robinson Affidavit, Exhibits 5 and 6].  These letters demonstrate defendant's ongoing

concern for the safety and security of the vessel while it is at defendant's premises.

A preliminary injunction is not warranted by  mere suspicion or conjecture that

irreparable harm might occur.  Instead, the plaintiff must "clearly show" that there is a

"substantial threat" of such harm.  *American Red Cross, supra*; *Canal Authority of State*

*of Florida, supra.*  Plaintiff has not carried, and cannot carry, that heavy burden of proof.


II.    PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS.

To obtain any type of injunctive relief, plaintiff must "clearly carry" the burden of

persuading the Court of the "substantial likelihood" that plaintiff will prevail on the

merits.  *American Red Cross, supra, Bank Leumi-Le-Isreal, B.M., supra.*  The issue in

this declaratory judgment action, on the merits of which plaintiff must prevail, is whether

defendant assumed the obligations of its seller, Palmer Johnson Savannah, Inc., to perform whatever contractual obligations Palmer Johnson Savannah, Inc. owes to plaintiff.  Plaintiff is not substantially likely to prevail on this issue.

Plaintiff relies on two documents to support its argument that defendant assumed the *Ionian Princess* contract from Palmer Johnson Savannah, Inc..  One is Schedule 2.1(e) to the Asset Purchase Agreement ("APA") between defendant and Palmer Johnson Savannah, Inc. [Doc. 7, pp. 7-8].  That schedule, which was supposed to contain the "Seller's Contracts" being assumed by defendant, was nothing more than a printout of the "current contracts" on which Palmer Johnson Savannah, Inc. was then working. [Ellis Affidavit, ¶ 5].  The schedule, which did list the *Ionian Princess* contract, formed a part of the APA which, by its terms, was effective as of February 28, 2003.

As of the effective date, February 28, 2003, the APA made remarkably plain that defendant had not yet assumed the *Ionian Princess* contract but had the right, in its sole discretion, to elect <u>after the closing</u> of the asset sale transaction to assume the contract.  The plain language containing the parties' intent to that effect is found in paragraph 2.5(b)(xix), which says that the liabilities for which the seller, Palmer Johnson Savannah, Inc., would remain liable included

> any Liability for performance under the contract relating to the yacht known as the "Ionian Princess," except that Buyer, at the Buyer's election and the Buyer's sole discretion, may choose <u>after the closing</u> to assume the obligation for performance under the contract relating to the "Ionian Princess," in which case Seller <u>will assign</u> said contract to the Buyer.  (underlining added).

The APA's section 2.1(e) and its Schedule 2.1(e) constitute *general* provisions relating to the contracts that defendant was assuming.  Section 2.5(b)(xix) is a *specific*

provision that deals expressly with the *Ionian Princess* contract. Under prevailing rules of contract construction, a specific provision controls over a general provision. *Goldberg v. Bear, Stearns & Co.*, 912 F.2d 1418, 1421 (11th Cir. 1990); *Schwartz v. Harris Waste Management Group, Inc.*, 237 Ga. App. 656, 661, 516 S.E.2d 371, 375 (1999). Moreover, when a contractual provision specifically addresses the issue in question, as section 2.5(b)(xix) does with the respect to the assumption of the *Ionian Princess* contract, it prevails over any conflicting general language. *Deep Six, Inc. v. Abernathy*, 246 Ga. App. 71, 74, 538 S.E.2d 886, 889 (2000). Accordingly, Section 2.5(b)(xix) controls in defining whether, when and how defendant could assume the *Ionian Princess* contract. Defendant did not assume the *Ionian Princess* contract under Section 2.5(b)(xix), which called for any such assumption to occur after the closing. The APA provided in Section 2.7 for the date of closing to be as follows:

> The purchase and sale provided for in this Agreement (the "Closing") will take place at the offices of Seller's counsel Lee, Black, Hart & Rouse, commencing at 10:00 a.m. EST on March 4, 2003, unless Buyer and Seller otherwise agree.

Although signatures required in connection with the closing were transmitted by fax and by overnight mail, the buyer and seller under the APA viewed the closing date to be March 4 and all of the documents utilized in the closing bear that date. [Ellis Affidavit, ¶ 8]. Accordingly, the mere inclusion of the *Ionian Princess* contract on a schedule that was effective as of February 28, 2003, four days before the closing date, did not operate to negate the very specific language from APA Section 2.5(b)(xix) quoted above that gave defendant the option to elect after the closing to assume the *Ionian Princess* contract if it chose to do so.

In addition to Schedule 2.1(e), plaintiff relies on a document entitled "Assignment and Assumption Agreement." [Doc. 7, pp. 9-10 and Exhibit 2]. This document, dated contemporaneously with the closing on March 4 and not after the closing, merely says that "Seller Contracts" are those identified on Schedule 2.1(e) and that defendant "assumes and agrees to perform the Seller Contracts as of the Closing." [Doc. 7, Exhibit 2, ¶¶ 1, 3]. The document contains no express reference to the *Ionian Princess* contract and does not represent an election by defendant after the closing to assume the *Ionian Princess* obligation.

Under Georgia law, contracts executed together as part of the same transaction should generally be construed together. *Maiz v. Virani*, 253 F.3d 641, 659 (11th Cir. 2001). This principle of construction, coupled with express references to the APA in the Assignment and Assumption Agreement, call for the two documents to be construed in light of each other.

The recital or "whereas" in the Assignment and Assumption Agreement limits the document to "the contracts assigned pursuant to the Asset Purchase Agreement." [ ]. As discussed above, the *Ionian Princess* contract was not assigned in the APA because of the specific language of APA section 2.5(b)(xix) that envisioned a post-closing election. Because the Assignment and Assumption Agreement is part of the closing documents [Ellis Affidavit, ¶ 7], it does not constitute a post-closing election by defendant to assume the *Ionian Princess* contract.

In an effort to show the intent of the parties to the APA, plaintiff attached to its brief a copy of an affidavit of Phillip Friedman, President of Palmer Johnson Savannah, Inc. [Doc. 7, Exhibit 3]. Mr. Friedman says in the copy of his affidavit that the APA, "by

- 11 -

its terms, provides for the Buyer's assumption of the Seller's liabilities under the Ionian Princess Contract, which is my understanding of the parties' intent as of the date of closing of the transaction."   [Doc. 7, Exhibit 3, ¶ 4].

Mr. Friedman's memory has evidently deserted him in the four months that have passed since the asset sale closed.   In an e-mail Mr. Friedman copied to Wiley Ellis on April 7, 2003, Mr. Friedman said as follows:  "As part of the PJ Savannah APA, PJ Savannah, LLC received assignment of the approximately $900K receivable on Ionian Princess (Haliklas), although it did not assume the contract between Haliklas and PJ Sav Inc." [Ellis Affidavit hereto, Exhibit 3].

The parties' intent must control in construing the Asset Purchase Agreement and other documents created pursuant to it.  Their intent with respect to the assumption of the *Ionian Princess* contract was plainly that defendant would decide after the closing whether to assume the contract.  Accordingly, plaintiff cannot prove a substantial likelihood that it will prevail on the merits.

III.   THERE IS NO BASIS FOR THE COURT TO REQUIRE DEFENDANT TO PUT UP A BOND OF $5 MILLION OR ANY OTHER AMOUNT.

In an apparent effort to rewrite the language of the Federal Rules of Civil Procedure, "Plaintiff requests that the Defendant be required to post a $5 million bond to ensure that the work is completed if the Court finds in the Plaintiff's favor."  [Doc. 7, p. 12].  Plaintiff understandably cites no legal authority to support its argument. Defendant has conducted exhaustive research and has found no cases in which a court required similar relief.

Plaintiff is the applicant on this motion for an interlocutory injunction. It thus is plaintiff who should put up a bond:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Rule 65(c), Fed. R. Civ. P.

Plaintiff wants the Court to rewrite plaintiff's contract with Palmer Johnson Savannah, Inc. to insert a requirement for what is tantamount to a performance bond. Performance bonds are sometimes required by the terms and conditions of construction contracts so that the property owner will have funds with which to complete the "performance" of the contract if the contractor does not perform.

Plaintiff chose not to require Palmer Johnson Savannah, Inc. to provide a performance bond as part of the *Ionian Princess* contract. Even if the Court rules that defendant assumed that contract, defendant's obligations could be no greater than those of the original contracting party, Palmer Johnson Savannah, Inc. *See Cox Broadcasting Corp. v. National Collegiate Athletic Assn.,* 250 Ga. 391, 395, 297 S.E.2d 733, 737 (1982)(holding that, when parties did not reach an agreement on a particular issue in their contract, injunctive relief cannot be granted on that issue.)

IV. THERE IS NO LEGAL BASIS TO ENJOIN DEFENDANT FROM CONVEYING ITS ASSETS.

According to its brief, "Plaintiff requests that the Court enjoin the Defendant from selling, transferring, encumbering or otherwise disposing of any of its assets." [Doc. 7,

- 13 -

pp. 11-12].  Plaintiff offers little reason why the Court should enjoin defendant from conveying its assets.  Plaintiff mentions that there is nothing that prevents defendant from transferring or selling its assets to another company and "carving out" the *Ionian Princess* contract and that there will be no point for plaintiff to sue defendant if it goes bankrupt.  [Doc. 7,  pp. 11-12].  Plaintiff also mentions that, by enjoining defendant from selling its assets or by requiring defendant to post a bond, the Court "guarantees that the work will be completed (either by defendant or another party) when the case is finished."  [Doc. 7, pp. 12-13].

The power of a district court to freeze a party's assets are severely limited.  In *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), the Court ruled that "the District Court had no authority to issue a preliminary injunction preventing [the defendant] from disposing of their assets . . ." in a claim for money damages.  *Id.* at 333.  The Court recognized narrow exceptions to the general rule where the plaintiff seeks, in his case on the merits, primary equitable relief of the same character sought in the preliminary injunction and where the plaintiff has a lien or equitable interest in the assets being frozen.  Neither exception applies here.

The plaintiff in this case seeks legal relief in the form of a declaratory judgment that defendant assumed a yacht construction contract.  Yet even if primary equitable relief is requested in a case, an asset freeze is an improper intermediate remedy where "the preliminary injunctive relief [is] of a different 'character' from the final relief sought and obtainable in the litigation." *Rosen v. Cascade Intl., Inc.,*  21 F.3d 1520, 1528 (11th Cir. 1994).

In *De Beers Consol. Mines v. United States*, 325 U.S. 212 (1945), the United

States brought suit against a number of corporations for antitrust violations. 325 U.S. at

214-15. The only remedy available was for the district court to issue orders restricting

future conduct of the corporations. *Id.* at 219-20. However, the district court issued a

preliminary injunction freezing the corporations' assets in the United States. *Id.* at

215-16. The Supreme Court stated that:

> A preliminary injunction is always appropriate to grant intermediate relief
> of the same character as that which may be granted finally. The
> injunction in question is not of this character. It is not an injunction in the
> cause, and it deals with a matter lying wholly outside the issues in the suit.
> It deals with property which in no circumstances can be dealt with in any
> final injunction that may be entered.

*Id.* at 220. The Court also noted that "Federal and State courts appear consistently to

have refused relief of the nature here sought." *Id.* at 221.

Here, a preliminary injunction freezing Defendant's assets is not an appropriate

remedy. Plaintiff is asking for a declaratory judgment as to the interests of the parties in

a yacht construction contract. Yet, plaintiff asks the Court to issue a preliminary

injunction freezing defendant's assets. Such an injunction is not of the same

"character" as the final declaratory judgment sought by plaintiff. As in *De Beers*, the

injunction Plaintiff seeks "deals with property which in no circumstances can be dealt

with in any final injunction that may be entered." 325 U.S. at 220. The district court has

no authority to issue a preliminary injunction freezing a defendant's assets in these

circumstances. *De Beers*, 325 U.S. at 223; *Grupo Mexicano*, 527 U.S. at 326-27.

Therefore, a freeze of defendant's assets is not an appropriate remedy in this case.

V.     IF INJUNCTIVE RELIEF IS AWARDED, PLAINTIFF SHOULD BE REQUIRED
       TO POST A BOND TO COVER DEFENDANT'S COSTS.

The applicant for injunctive relief must give security, in an amount deemed proper by the Court, for payment of such costs and damages as may be incurred by a defendant found to have been wrongfully enjoined.  Rule 65(c), Fed. R. Civ. P.  If the Court rules in defendant's favor on the merits, plaintiff should be compelled to pay storage fees on the vessel at the commercially reasonable rate of $3.00 per day.  As the vessel is 146 feet long, the daily storage fee is thus $438.00 plus any other direct expenses, such as electric utility costs, that defendant incurs.   Such storage fees have accrued since at least May 2003.  [Robinson Affidavit hereto, ¶ 17].  If injunctive relief is granted, defendant asks the Court to require plaintiff to put up a bond to cover all storage fees and any other expenses defendant may incur.

ELLIS, PAINTER, RATTERREE & BART LLP

By: _____

PAUL W. PAINTER, JR.
Georgia Bar Number 559450
Attorneys for Defendant

Post Office Box 9946
Savannah, Georgia  31412-0146
(912)  233-9700

- 16 -

## CERTIFICATE OF SERVICE

I, Paul W. Painter, Jr., certify that on this day a copy of the foregoing Response

to Motion for Preliminary Injunction was mailed to the following counsel:

> Frank W. Seiler, Esq.
> Carlton E. Joyce, Esq.
> Bouhan, Williams & Levy, LLP
> P. O. Box 2139
> Savannah, GA 31402

This 21st day of July, 2003.

Paul W. Painter, Jr.
Georgia Bar Number 559450
Attorneys for Defendant

# EXHIBIT   A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

M. H. YACHT SALES, INC.,                     )
                                             )
            Plaintiff,                       )
                                             )
v.                                           )   CIVIL ACTION NO. CV403-115
                                             )
PALMER JOHNSON SAVANNAH, LLC,                )
                                             )
            Defendant.                       )

## AFFIDAVIT OF M. GREGG ("SKIP") ROBINSON

PERSONALLY APPEARED before the undersigned officer, duly authorized to administer oaths, M. GREGG ("SKIP") ROBINSON, who being duly sworn, deposes and says that::

1.a.    I am Vice President of Palmer Johnson Savannah, LLC and have personal knowledge of the facts in this affidavit. My current job responsibilities include managing the Palmer Johnson Savannah, LLC shipyard located at Thunderbolt, Georgia, and overseeing the construction and/or refit of approximately seven (7) large vessels over 100 feet, plus approximately twelve smaller vessels between 50 feet and 100 feet, currently located in that shipyard. I have served in my current position since March of 2003.

1.b.    Before becoming employed by Palmer Johnson Savannah, LLC in March of 2003, I was employed by Palmer Johnson Savannah, Inc. I am familiar with the contract between Palmer Johnson Savannah, Inc. (now "Savannah Yacht Corp.") and M. H. Yacht Sales, Inc., the owner of the *Ionian Princess* for the completion of the *Ionian Princess* (the

"IP Contract"). In addition, I have personal knowledge of the treatment of the *Ionian Princess* since its arrival at the Thunderbolt, Georgia shipyard in 2001.

    1.c.    I have been employed in the boat and yacht industry for over 30 years. My experience in the yacht repair and construction industry includes, but is not limited to, the following: President and Treasurer of a full service yacht yard and marina facility (1969-1988); President of a company that provided consulting and management services in the area of yacht purchase, repair and construction (1978-1998); General Manager of a company specializing in the construction of semi-customer fiberglass coastal cruisers (1986-1988).

    2.    As of March 4, 2003 (the "Closing Date"), Palmer Johnson Savannah, LLC, a Georgia limited liability company purchased certain assets from Palmer Johnson Savannah, Inc., a completely separate company.

    3.    I have information and belief that Palmer Johnson Savannah, Inc. has changed its name to "Savannah Yacht Corp," but I will continue to refer to the entity as Palmer Johnson Savannah, Inc. in this affidavit.

    4.a.    In the Asset Purchase Agreement, Palmer Johnson Savannah, LLC assumed only the account receivable relating to the *Ionian Princess*, and it did not assume any liability, or any obligation to perform, under the IP Contract. Even though Palmer Johnson Savannah, LLC reserved the right to assume the IP Contract at its election in its discretion, Palmer Johnson Savannah, LLC never made such an election after the Closing Date, and the IP Contract was never assigned to Palmer Johnson Savannah, LLC by Palmer Johnson Savannah, Inc. After the asset purchase from Palmer Johnson Savannah, Inc.,

- 2 -

Palmer Johnson Savannah, LLC agreed to perform work on the *Ionian Princess,* but only as a subcontractor of Palmer Johnson Savannah, Inc.  Palmer Johnson Savannah, LLC performed this work at the specific direction of Philip Friedman, president of Palmer Johnson Savannah, Inc.

4.b.    Philip Friedman, President of Palmer Johnson Savannah, Inc., sent an e-mail to me on March 17, 2003 (4:37 PM), in which Mr. Friedman referred to the relationship between Palmer Johnson Savannah, LLC and Palmer Johnson Savannah, Inc. for the work that Palmer Johnson Savannah, LLC performed on the *Ionian Princess* as a "sub-contract." An accurate copy of Mr. Friedman's e-mail of March 17, 2003 (4:37 PM) is attached hereto as Exhibit 1.

5.    As a subcontractor of Palmer Johnson Savannah, Inc. and at the direction of Phil Friedman, its president, Palmer Johnson Savannah, LLC performed work on the *Ionian Princess* at the rate of $40 per hour, and billed the following amounts:

[*table provided on the following page*]

- 3 -

| Date | Invoices | Payments | Balance | |
|------|----------|----------|---------|---|
| 21-Mar-03 | 9,307.00 | 9,307.00 | | Labor |
| 28-Mar-03 | 11,070.00 | 11,070.00 | | Labor |
| 28-Mar-03 | 2,413.76 | | | Materials |
| 31-Mar-03 | 2,357.50 | | | Labor |
| 4-Apr-03 | | 22,796.00 | | |
| 5-Apr-03 | 22,970.25 | | | Labor |
| 5-Apr-03 | 1,995.01 | | | Materials |
| 6-Apr | 6,453.18 | | | L & M from 3/21 |
| 11-Apr | 4,878.41 | | | L & M from 4/11 |
| | 61,445.11 | 43,173.00 | 18,272.11 | |

6.     As instructed by Palmer Johnson Savannah, Inc. (the contractor), Palmer Johnson Savannah, LLC submitted statements for the work it performed directly to Michael Halikias, the owner of M.H. Yacht Sales, Inc.  Palmer Johnson Savannah, LLC stopped performing the work on the *Ionian Princess* as a subcontractor sometime in March or April of 2003 when M. H. Yacht Sales stopped paying Palmer Johnson Savannah, LLC for the work performed on the *Ionian Princess* and M.H. Yacht Sales refused to sign work orders executed by Palmer Johnson Savannah, LLC.  As of the date of this affidavit, the vessel remains in the exact same condition it was in when work was stopped.

- 4 -

7.a.    Any claim that the *Ionian Princess* "has deteriorated and is in danger of being completely lost" is incorrect and unfounded.  Any allegation that Palmer Johnson Savannah, LLC has engaged in a "strategy designed to destroy (rather than preserve) the *Ionian Princess*" is also incorrect and unfounded.  The vessel is being maintained in almost the exact same manner, if not in a better manner, as the other vessels in the Thunderbolt shipyard.  Most of the other vessels under construction or reconstruction in the shipyard are not covered by any building or tarp.  It is not standard in the industry to cover vessels under construction that are at the same level of completion as the *Ionian Princess*. Vessels such as the *Ionian Princess* are made to be housed outdoors and are made to withstand exposure to the elements.  The IP Contract, an accurate copy of which is attached hereto as Exhibit 2,  does not require that the vessel be housed under any type of cover.  It is erroneous to suggest that the *Ionian Princess* "will be ruined" if the tent is removed.

7.b.    The *Ionian Princess* is approximately 68% complete with approximately 40,000 hours of labor remaining to finish the vessel. On a time and materials basis (with time charged at a commercially reasonable rate of $40 per hour), the estimated cost of completion of the vessel (without change orders) should not exceed $2,000,000, subject to final selection of materials and furnishings not already identified.

8.a.    There are no "gaping holes" in the vessel, and the hull and exterior of the vessel are substantially complete, with primarily cosmetic finishing and outfitting to be performed on all but the sundeck area of the exterior. The sundeck area is not  completed due to the failure of Mr. Halikias to approve the final design.  As described more fully

- 5 -

below, the vessel would be seaworthy with only minor plugging of several shaft logs, rudder ports and several through-hulls in the hull. The interior of the vessel is in a partially constructed and unfinished state. The interior construction consists of mostly plywood with some finished wood, tile and marble, and some bathroom hardware installed, and there is no fabric on the interior.

8.b.    Currently, the vessel has many of its windows and all of its portholes in place. Any windows not glassed are covered by form-fitting plywood shields, and there are no gaping holes or open hatches on the vessel. Even though the vessel's openings are covered, the vessel is currently under a tarpaulin cover over a large scaffold frame which is sufficiently anchored. This tarpaulin has been in place continuously even though the IP Contract does not require that the vessel be housed under any type of cover. Recently, the only gap in the tarp consisted of a 1 inch by 4 foot gap at a seam, which gap has already been repaired. Palmer Johnson Savannah, LLC has no plans to remove the tarpaulin covering from the *Ionian Princess* unless such removal becomes necessary in the event of a hurricane. To the best of my knowledge and belief, there are presently no holes in the tarpaulin as of the date of this affidavit.

8.c.    To the best of my knowledge and belief, rain is not getting into the vessel or damaging the electrical wiring. The electrical wiring in the interior of the vessel is approximately 75% complete and properly insulated. The installation is in compliance with the applicable certifying society. Approximately 65% of the furniture is built and ready to be installed. I am confident that there is no danger of the electrical wiring being damaged by rain, sawdust, or dirt.

- 6 -

9.     A venting system is hooked up to the *Ionian Princess* and, since stopping work on the vessel, Palmer Johnson Savannah, LLC periodically connected air conditioners to the vents to provide climate control to the vessel. Since mid-July (2003), an air conditioning system has been hooked up to the *Ionian Princess* and has been running 24 hours a day to cool the vessel, even though I believe this measure is not necessary.  There is absolutely no evidence of mold or mildew on the *Ionian Princess*. The furniture, plywood, finished wood, and other material on the boat are in the exact same condition as on the date work was stopped on the vessel. There is no evidence of any moisture on the *Ionian Princess*, and there is no evidence of any deterioration of the wiring, wood, marble, tile, or any other materials on the vessel.  In my professional experience based on more than 30  years of experience in the boat industry, the *Ionian Princess* is in no danger, and has never been in any danger, of being damaged by mold, mildew, or moisture, and the ventilation measures that have been utilized since work ceased have always been entirely adequate.

10.     Palmer Johnson Savannah, LLC did remove its working tools from the *Ionian Princess* when work was stopped on the vessel and no agreement had been reached with the boat owner for Palmer Johnson Savannah, LLC to finish the project.  The tools that were removed from the vessel are not required to be on the vessel because no work is currently being performed by Palmer Johnson Savannah, LLC and the tools are currently being utilized by Palmer Johnson Savannah, LLC on other projects in the shipyard.  The removal of the tools in no way jeopardizes the integrity of the vessel.

- 7 -

11.    The Palmer Johnson Savannah, LLC Thunderbolt shipyard is a thriving work site and is far from being "abandoned." Although Palmer Johnson Savannah, LLC has laid off some workers, there are between 35 and 50 employees working at the Thunderbolt facility during work hours 5 ½ days a week. During work hours, a Yard Superintendent and several Project Managers are also on the Thunderbolt premises. While administrative offices of Palmer Johnson Savannah, LLC were consolidated with those at the Lathrop Avenue location as of July 7, 2003, the Thunderbolt shipyard is an active operational site where seven large boats (100' to 182'), and approximately twelve small boats (under 100'), having a total estimated commercial value of approximately $75,000,000, are currently undergoing work. The security gate at the Thunderbolt facility continues to be manned 24 hours a day by a private security agency in a manner consistent with the way it has been manned since the *Ionian Princess* arrived at Thunderbolt in May of 2001. There has been no change in the manner in which security is provided to the Thunderbolt shipyard since Palmer Johnson Savannah, LLC purchased the assets of Palmer Johnson Savannah, Inc.

12.    Richard Waite, one of the support engineers who was assigned exclusively to the *Ionian Princess* project late in the life of the process, was assisting with the *Ionian Princess*, but his presence is not necessary to complete the *Ionian Princess*. Palmer Johnson Savannah, LLC still has an engineering department of approximately 12 to 14 people, and Palmer Johnson Savannah, LLC could easily re-man the *Ionian Princess* project in the event an agreement is reached between Palmer Johnson Savannah, LLC and the vessel owner.

- 8 -

13.    The *Ionian Princess* is in no danger as a result of a limited bulkhead failure that occurred more than a month ago at a location at the river's edge  which is more than 60 feet away from the vessel. The vessel is currently setting on a concrete platform that is independently pile-supported. The exposed gas line associated with the bulkhead failure was repaired within a few hours from the time when the bulkhead initially failed more than a month ago. Palmer Johnson Savannah, LLC is currently negotiating with the landlord of the Thunderbolt premises to address the bulkhead repair, and there is no evidence of on-going degradation of the area.

14.    The *Ionian Princess* is still setting on blocks at the same location and in the same manner that it has set since its arrival at the Thunderbolt facility 2 ½ years ago. The *Ionian Princess* can be moved from its location in the same manner in which it arrived. The vessel originally arrived by tow from Port Everglades to Savannah, and the vessel could be launched in the same manner that it was originally hauled.  All that would be necessary to make the vessel seaworthy would be to plug the shaft logs, rudder ports and several through-hulls which could be done in approximately 2 days.  The vessel could be launched in the same manner that it was hauled, i.e. house-movers would jack up the cradling, slide the vessel laterally to the transfer table, and then slide the vessel to the elevator from where it would be launched.

15.    Palmer Johnson Savannah, LLC has not stolen any materials that have been purchased for the *Ionian Princess*.  On May 5, 2003, in the presence of Captain Vernicos, Palmer Johnson Savannah, LLC entered into the storage trailer owned by M.H. Yacht Sales with a key that has been left in the possession of Palmer Johnson Savannah, LLC.

- 9 -

With the knowledge of Captain Vernicos,  Palmer Johnson Savannah, LLC removed several inexpensive items from the trailer consisting of two 45 degree and two 90 degree copper-nickel fittings with a wholesale value of less than $25.00. These items were removed to fill an immediate need on another vessel being constructed, and it was explained to Captain Vernicos that either the items would be replaced or the value of the items would be credited to the account relating to the *Ionian Princess*. This procedure was a normal practice at the shipyard.

16.a.   Palmer Johnson Savannah, LLC has repeatedly made good faith offers to the owner of the *Ionian Princess* to enter into a separate agreement to complete the *Ionian Princess*, but an agreement has not been reached.

16.b.   I received a letter dated May 27, 2003 from Captain Vernicos in which he raised the issues of hurricane preparedness and security measures with regard to the *Ionian Princess*.  I responded to that letter by way of letter dated May 29, 2003 in which I represented that Palmer Johnson Savannah, LLC was addressing concerns regarding security and hurricane preparedness, and agreed to take every reasonable effort to ensure the safety of the *Ionian Princess*. An accurate copy of Captain Vernicos' letter dated May 27, 2003 and my responding letter dated May 29, 2003 [which erroneously refers to the date of Captain Vernicos' letter as May 25, 2003] are attached hereto as Exhibit 3.

16.c.   I also received a June 6, 2003 letter from Captain Vernicos.  I responded to that letter by way of letter to Captain Vernicos dated June 20, 2003 in which I provided Captain Vernicos with a Hurrican Preparedness Plan, and indicated that Palmer Johnson Savannah, LLC would comply with the Hurricane Preparedness Plan with regard to the

Ionian Princess. An accurate copy of Captain Vernicos' letter dated June 6, 2003 and my letter of June 20, 2003 are attached as Exhibit 4.  A true and correct copy of the Palmer Johnson Savannah, LLC Hurricane Preparedness Plan (referred to in my June 20, 2003 letter to Captain Vernicos) is attached hereto as Exhibit 5.

16.d.  Palmer Johnson Savannah, LLC is caring for the Ionian Princess in the same manner and fashion that it is caring for the other boats currently being worked on at the premises (as many as 7 larger vessels and 12 smaller boats).

17.    Through its attorney, Paul Painter, Palmer Johnson Savannah, LLC communicated to Mr. Halikias (through his attorneys, Frank W. Seiler and Carlton E. Joyce) by way of letter dated April 16, 2003 that Mr. Halikias was free to remove the Ionian Princess from the Thunderbolt shipyard. Mr. Painter also advised Mr. Halikias that, after May 16, 2003, a storage fee would be charged for the storage of the Ionian Princess in the amount of $3 per foot per day. Mr. Halikias has not paid any storage fees to Palmer Johnson Savannah, LLC. I received a copy of this correspondence in my duties as Vice President of Palmer Johnson Savannah, LLC, and an accurate copy of that April 16, 2003 letter is attached as Exhibit 6.

18.    The following list describes digital photographs (taken by me on July 17, 2003 using a digital camera) of the interior and exterior of the Ionian Princess, as well as the cover above the Ionian Princess:

[list provided on the following page]

- 11 -

a.  Aft view of the rear of the vessel from a distance
b.  View of the tarpaulin cover from aft
c.  Port side view of hull
d.  View of underside hull
e.  Windows on the side
f.  View of the tarpaulin from below
g.  Window - closeup view
h.  Front/starboard view of hull & side
i.  Front/port side view hull & side
j.  Close-up of windows from the outside
k.  View of portable air conditioning unit
l.  Starboard side from of vessel - view of air vents going into vessel
m.  Starboard side - windows covered
n.  Starboard side - openings covered
o.  Starboard side - windows and openings covered
p.  Front windows
q.  View of tarpaulin from top of boat
r.  View of deck of boat from above
s.  View of tarp from top of vessel
t.  Close-up view of tarpaulin
u.  Interior wood
v.  Interior stairs
w.  Interior wiring
x.  Interior window/porthole
y.  Interior shot w/ window
z.  Interior portholes
aa. Interior windows - deck
bb. Interior view of a room
cc. Interior shot showing covered openings
dd. Interior view of a room
ee. Exterior of the vessel from a distance on the starboard side

An accurate print-out of the above- listed digital photographs are attached hereto as

Exhibits 7.a. through 7.ee. with the corresponding photograph number on the bottom of

each page.

M. Gregg Robinson

Sworn to and subscribed before

me this 21 day of July, 2003.

Notary Public, Chatham County,
Georgia

- 12 -

# EXHIBIT 1

## Skip Robinson

| | |
|---|---|
| **From:** | Plfmail@cs.com |
| **Sent:** | Monday, March 17, 2003 4:37 PM |
| **To:** | skip@pjsavannah.com |
| **Cc:** | tim@noblesea.freeserve.co.uk |
| **Subject:** | Re: : IONIAN PRINCESS Contract and Arbitration |
| **Follow Up Flag:** | Follow up |
| **Due By:** | Friday, May 30, 2003 12:00 AM |
| **Flag Status:** | Flagged |

Skip,

My recommendation is to continue the billing by PJ Savannah Inc. (with sub-contract payments passing through dollar for dollar to PJS LLC), to avoid creating any new obligations of the part of PJS LLC. Later, if a settlement can be reached, a new contract can be drawn with PJS LLC.

Best. Phil

# EXHIBIT 2



# PALMER JOHNSON
*Savannah*

### AGREEMENT
### FOR THE COMPLETION
### OF
### M/Y IONIAN PRINCESS

Submitted to: MH YACHT SALES, INC.

Submitted by: PALMER JOHNSON SAVANNAH, INC.

This Agreement is entered into this___27th___day of April, 2001, by and between MH YACHT SALES, INC., hereinafter "Owner," whose address is 15750 South Harlem Avenue, Suite 25, Orland Park, Illinois    60462, and PALMER JOHNSON SAVANNAH, INC., hereinafter "Shipyard", whose address is 3124 River Street, Savannah, Georgia 31404.

## GENERAL TERMS and CONDITIONS

Shipyard shall complete the vessel in accordance with the SCOPE OF WORK set forth in Exhibit A, the specifications provided by Shipyard more particularly described in Exhibit A-1, and the terms of this Agreement. Owner represents having reviewed, critiqued said modifications and specifications contained therein and approves same. As consideration for Shipyard's agreement to perform said completion services, Owner agrees to pay Shipyard monies specified in Exhibit B CONTRACT AMOUNT, denominated in United States currency, in accordance with the terms and conditions contained herein (see PAYMENT). DELIVERY and RE-DELIVERY of the vessel shall be conducted in accordance with the terms stipulated herein.

Shipyard shall bill Owner on a bi-monthly basis (i.e., twice each month) for work performed during the billing period based on a blended rate of $50.00 per hour for all labor other than engineering, $65.00 per hour for engineering (subject to the allowance set forth in Exhibit B), and materials and subcontractors' charges at Shipyard's cost, plus 15%.. Shipyard's invoice shall reference each job described in the quote, or later change order, by its own assigned number and shall reflect all time and materials billed to that job during the billing period.

Owner shall have ten (10) business days from the date of receipt of each invoice to review Shipyard's invoice and supporting documents, including time cards and materials purchase orders (which Shipyard shall make available to Owner), as to a payment

requested and to make the required payment; provided, however, that if Owner disputes that payment is owed, he shall, within the same ten (10) business day period, issue a statement detailing the work to be performed or corrected, or the documents to be provided, before the payment is earned and the requested payment shall not be due until Shipyard meets such requirements to Owner's reasonable satisfaction.   If Shipyard questions Owner's conclusion, the dispute shall be referred to arbitration pursuant to terms of arbitration set out herein and Shipyard, at is option, may stop work.

Upon execution of this agreement Owner shall place on deposit with Shipyard one (1%) percent of the contract amount, or fifty-eight thousand ($58,000) dollars, which is to be applied to the final payment.   Upon arrival of vessel at Shipyard Owner will pay an additional one (1%) percent of the Contract Amount, or fifty-eight thousand ($58,000) dollars, which will be credited to the first bi-weekly invoicing.

Upon final payment Shipyard shall provide evidence confirming that all third party vendors, suppliers, materialmen, and workmen that have worked on, or provided services or materials for the benefit of, the Vessel have been paid all sums due their contracts with Shipyard.

The Shipyard's quote represents a fixed price, other than change orders.  Accordingly, if and when Shipyard's time and materials charges equal Shipyard's quote, Shipyard shall complete all further work at its expense, without further cost to Owner.  Conversely, if at the time of completion, Shipyard's aggregate time and materials charges are less than Shipyard's quote, Owner shall pay Shipyard the balance remaining in one lump sum.

## Changes Orders

Owner may request and Shipyard may recommend from time to time during the term of this Agreement, and any extensions thereof, additional work (including work required to correct defects or deficiencies in work previously performed by others) not contained in the "SCOPE of WORK", Exhibit A. Any such additional work will be estimated for Owner and contractually provided for on a fixed price; provided, however, that where it is not possible for work to be quoted, the parties may agree to proceed on a time and materials basis, at the rates set forth above, in which case it becomes incumbent for Owner to raise any objection to charges as they occur and not at the completion of the work. Shipyard shall bill Owner for fixed price change orders bi-monthly based on time and materials devoted to the job (assessed at the same rates set forth above); provided, however, that Shipyard shall not bill Owner for any amounts in excess of the fixed price change order and Owner shall pay Shipyard any unpaid portion of the fixed price with the first bi-monthly bill sent following completion of the work. Shipyard shall provide periodic updates on T&M jobs as requested by Owner; however, no more frequently than every second business day.

A separate Work Order or Work Requisition document (hereinafter called a "Change Order") signed by Owner, or Owner's representative and Shipyard is sufficient evidence

n\sr.ionianprincess agrmnt-rev 04.26.01

- 2 -

of Owner's contractual obligation to pay for the desired additional work, and Shipyard shall not undertake any work for which it intends to seek additional payment unless and until a Change Order is executed by both parties.

Owner agrees that Change Orders may cause the Completion Date to be extended. Said extensions, if necessary, shall be mutually agreed to in writing by Shipyard and Owner, and documented in each Change Order. If any Change Order makes no reference to extension of the Completion Date it shall be deemed to have no such effect.

If authorized work is canceled, Shipyard shall attempt to minimize costs; however, costs incurred prior to cancellation shall be an obligation of Owner to Shipyard.

Shipyard shall provide labor assistance to Owner, crew, and Owner's contractors on a T&M basis; however, assistance must be requested by Owner and signed for on a work requisition document.

## Authorized Signatures

Prior to any work commencing on the vessel Shipyard must have in writing who is the authorized representative with the authority to approve the work and sign any Change Order or request for additional services. If there are Owner designated limits as to a maximum amount imposed on Owner's representative, Shipyard must be made aware of these limits in writing or it is agreed that the representative has the full authority to sign all Change Orders and request for additional services and to otherwise act on Owner's behalf.

## Delivery and Re-Delivery

The vessel shall arrive at Shipyard on or before May 14, 2001 ,and be cleared by US Customs and Immigration, if necessary. The crew and Shipyard shall decommission the vessel to a condition whereby yard employees may haul the vessel. Shipyard shall complete work no later than November 1, 2002 ("Completion Date"), *unless extended pursuant to the terms of this Agreement* ("Revised Completion Date"). The vessel shall be Re-Delivered to Owner on or before the Completion Date, or Revised Completion Date, if appropriate, at Shipyard's facility upon payment in full of all sums due Shipyard.

Shipyard and Owner agree that the redelivery date shall be extended by one working day for each working day that is lost due to the following causes: (1) the failure of Owner to ① provide instructions as to any Owner selected item on the date that Shipyard and Owner have agreed in writing that each such item shall be selected, or, failing such agreement, on the date (reasonably determined) which Shipyard has notified Owner in writing that selection of such item is required, (2) failure of Owner to respond to or authorize a ② proposal by Shipyard for a decision with respect to a written proposal for emergent work during the completion within seven (7) days of the delivery of such proposal to Owner; for all other scheduled work decisions Shipyard will require a fifteen (15) working days

response, (3) the inability of Shipyard to obtain material and equipment necessary to continue the completion of the vessel in a timely fashion; provided, Shipyard has used the diligence reasonably expected of a company which is regularly engaged in the completion of vessels and ordering equipment and material necessary to accomplish them, (4) failure of Owner to provide Owner supplied plans or engineering materials which Shipyard deems in it's sole judgment necessary to effect completion, (5) strike, fire, accident, lock-out, act or order of government authority, Act of God, force majeure, and/or other cause beyond the reasonable control of Shipyard, or (6) Owner approved Change Orders, but only to the extent specified in the written Change Order. Shipyard shall notify Owner in writing of any event giving rise to a delay claim as described in subparagraphs 1 through 5 above within five business days of its occurrence, specifying the nature of the event and expected delay arising therefrom. Shipyard's failure to provide timely notice shall be deemed a waiver of its right to claim delay based on such event.

## Access to Vessel

Owner and/or Owner's Representative shall have full and free access to the vessel 24 hours per day *except* when the vessel is being painted, or immediately following painting when there is a danger of contamination of completed work, or when health and safety issues are a consideration.

Crew access to the vessel when inside a building will be limited to normal shipyard working hours. Owner must make arrangements through the Project Manager or General Manager for access to the vessel after normal working hours.

## Crew Members

A written roster must be provided to Shipyard that identifies all crewmembers who are to be allowed in the yard. Crewmembers who are to be allowed in the yard after normal working hours must also be specifically designated on the roster. This roster will be posted at Shipyard security gate and individuals not designated on the roster will be denied access.

Crewmember use of any yard or marina equipment, tools, or facilities is forbidden unless specifically approved in writing by Shipyard. In the interest of safety, the use of proper footwear is required of all persons within the confines of the yard. All crewmembers performing work within the confines of the yard must comply with the rules and regulations of the Occupational Safety and Health Administration (OSHA), other regulatory bodies, and yard safety rules and conditions. Owner may purchase safety equipment through the yard stockroom, yard purchasing department, or an outside vendor.

n\:sr.ionianprincess agrmnt-rev 04.26.01

- 4 -

## Insurance

Shipyard property insurance covers only those items of property and equipment owned by Shipyard. Shipyard is not considered under this Agreement to be an insurer of Owner's vessel, other property or liability exposures. Owner accepts responsibility to secure and maintain insurance for the benefit of Owner while the vessel is in the yard and to check with Owner's insurance carrier to ascertain any additional coverage deemed appropriate to cover Owner's vessel, equipment, and liability exposures.

Shipyard liability insurance covers indemnification for claims arising from the negligent or wrongful acts of Shipyard's employees and subcontractors. Owner accepts responsibility to secure and maintain liability coverage for the acts of its representative, crewmembers, and subcontractors.

Owner, heirs and assigns hereby agree to release, hold harmless, defend, and indemnify Shipyard, its officers, employees, and subcontractors from any and all liability for property damage, personal injury, and loss of life involving any crew member or Owner's representative arising out of, or in connection with the use (including, but not limited to, oil spills from pumping bilges or refueling operations) or condition of the vessel and the use of yard premises and equipment except and to the extent the property damage, personal injury, or loss of life is attributable to Shipyard's negligence or improper act or omission.

## Subcontractors

No subcontractor shall be permitted to work in the yard or on any vessel in the yard without prior written consent of Shipyard, except for those pre-approved Owner retained subcontractors described in **Exhibit C** ("hereinafter called Pre-approved Subcontractors"). All Subcontractors shall be required to provide proof of worker's compensation, liability insurance and indemnity coverage for losses (including costs of defense) incurred by the Shipyard through the negligence of the subcontractor or other third parties engaged by the subcontractor, and not caused by the negligence of the Shipyard (to the extent such indemnity coverage is available at reasonable commercial rates). A surcharge for the benefit of Shipyard shall be added to the subcontractor's total invoice amount, except for Pre-approved Subcontractors.

The parties shall cooperate in coordinating Shipyard's work and the work of Owner's subcontractors. Shipyard shall notify Owner, in writing, if Owner's subcontractors fail to adhere to the agreed schedule and provide Owner a reasonable opportunity to resolve any scheduling conflict. If Owner is unable to resolve such conflict, Shipyard shall be entitled to assert a claim for extension of the Completion Date to account for any resulting delay in construction.

## Storage

Shipyard may provide a storage locker during the vessel's stay for $200 per month. Owner is responsible for ensuring security for the locker at all times. Shipyard assumes no responsibility or liability for the safekeeping of the storage locker or its contents.

## Crew Purchases

Crewmembers may from time to time purchase from the yard stockroom maintenance and repair parts and materials for the vessel. If such an account is to be established, Owner will place on deposit with Shipyard an amount to be mutually agreed upon with Shipyard and will restore this balance monthly in accordance with Shipyard report of purchases. Such purchases will be billed to Owner as "CREW PURCHASE." Prior to opening a crew purchase account, Owner must provide a list of crewmembers authorized to make purchases and establish a limit, if desired, to be placed on crew purchases. Limitations on crew purchases shall apply to all crewmembers on the authorized list.

## Taxes and Fees

Owner shall be solely responsible for the payment of all sales taxes. Sales tax will be charged on all materials supplied by Shipyard and on all subcontractor invoices where labor and materials are quoted as one price (Shipyard, however, shall direct its subcontractors to bill separately for labor and materials to minimize the Owner's tax obligation). The application of sales tax is based on Shipyard material charges and will be added to the invoice as appropriate.

## Freight Charges

Equipment and materials not customarily maintained in yard inventory, and not included in the Scope of Work (Exhibit A) will be specially ordered (special orders) for the vessel. Freight charges for special order items will be paid by Shipyard on behalf of Owner. Shipyard shall invoice Owner for the equipment and materials at cost plus fifteen (15%) percent and applicable freight charges.

## Telephone Service

Long distance telephone charges will be charged directly to Owner. A deposit in the amount of $1,000 per telephone line is required prior to Shipyard providing dialing access codes for long distance dialing. A final long distance charges invoice will be produced after departure of the vessel from the yard.

## LIMITED WARRANTY:

Shipyard agrees to repair, or at its option replace with new or factory reconditioned parts reasonably satisfactory to Owner, any defects in workmanship, parts, machinery or equipment supplied to the vessel which are discovered to be defective within one year

n\:sr.ionianprincess agrmnt-rev 04.26.01

- 6 -

after re-delivery of the vessel; provided, Shipyard shall not be liable for the costs of correcting defects to the extent they are due to: ordinary wear and tear, accidents, improper docking or undocking, improper or inadequate maintenance, improper use, acts of God, fire (unless caused by a covered defect), unauthorized alterations or modifications, continued operation after a defect becomes known or should have been known (unless reasonably unavoidable), failure of Owner, Owner's representative or employees to detect a defect and cure same in a timely manner, defects in materials or components which are the subject of any written manufacturer's warranty (except as to installation and operation of such items, as set forth below), defects in materials, components, and services provided by contractors hired by Owner, or defects and failures caused by errors, omissions, negligence, and improper acts of any person other than an employee or subcontractor of Shipyard. The warranty of the manufacturer of purchased machinery and equipment shall be assigned by Shipyard to Owner, and Shipyard's obligation with respect to such machinery or equipment shall be limited to the cost of correcting defects arising from Shipyard's improper installation or operation of such machinery or equipment before delivery of the vessel. Owner may not assign this warranty without Shipyard's consent to any purchaser who has been involved in litigation or arbitration with Shipyard or any of its affiliated entities or who has threatened in writing to initiate litigation against Shipyard or any of its affiliated entities; otherwise, Owner may assign this warranty to any purchaser of the vessel without restriction; provided, however, any such assignment shall not extend the warranty period or expand Shipyard's warranty obligations.

Owner shall promptly notify Shipyard, in writing by registered mail return receipt requested, fax or cable of the discovery of any defects for which a claim is to be made under this limited warranty, advising Shipyard when the vessel will be available for examination of such defects.

All work performed by Shipyard pursuant to this limited warranty shall be performed at Shipyard's facilities at 3124 River Drive, Savannah, Georgia; provided, however, that if given the vessel's location and the nature of the required work, it would be impractical for Owner to bring the vessel to Shipyard's facilities, Owner, subject to Shipyard's reasonable approval, may make arrangements for the work to be performed at Shipyard's expense at another facility skilled in the repair of vessels of like size and quality that is reasonably convenient to the vessel, or alternatively, Shipyard, at its expense, may send its own workers to the vessel. Owner shall pay the travel and lodging expenses for Shipyard's workers if the Vessel is not reasonably convenient to a suitable facility or if the rates charged by those suitable facilities reasonably convenient to the Vessel are materially in excess of those prevailing at Shipyard. In the absence of specific authorization from Shipyard, Shipyard shall not be liable, and does not authorize any person to assume any liability on its behalf for repair work covered by this Warranty that is performed by anyone other than Palmer Johnson Savannah, Inc.

If Shipyard damages any part of the vessel, Shipyard shall repair the damage at its own expense to the condition prior to the subject damage.

n\:sr.ionianprincess agrmnt-rev 04.26.01

## DISCLAIMER OF WARRANTIES AND LIMITATION OF REMEDIES

SHIPYARD MAKES NO WARRANTY, EXPRESSED OR IMPLIED, INCLUDING MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE EXCEPT AS EXPRESSLY STATED HERE. SHIPYARD SHALL NOT BE LIABLE FOR LOSS OF USE OF THE VESSEL, LOSS OF TIME, INCONVENIENCE, RENTAL OR SUBSTITUTE VESSELS, LODGING, DRY DOCKING, TOWING, LOSS OF BUSINESS OR ANY OTHER INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM ANY ALLEGED BREACH OF THIS WARRANTY. SHIPYARD'S LIABILITY IS LIMITED TO THE REPAIR OF THE VESSEL.

<u>SEE "ASSUMPTIONS" NUMBERS 5 AND 8 FOR FURTHER LIMITS TO SHIPYARD LIABILITY AND MADE A PART OF THIS SECTION.</u>

<u>EXTERIOR PAINT TO BE WARRANTED BY OWNER'S SUBCONTRACTOR.</u>

### LIEN

Owner acknowledges Shipyard shall have an express mechanic's lien against the described vessel and its contents for unpaid sums due owed to Shipyard for labor, material, equipment, and other services, damages, liabilities, and expenses provided or incurred on behalf of Owner, Owner's representatives, employees, and subcontractors. The term "necessaries" as used in Title 46, Section 971, et seq. Of the United States Code shall include any and all attorney's fees and the costs of collecting unpaid sums whether in judicial proceedings and appeals there from or otherwise. Owner further agrees to submit the vessel to the provision of Federal 'Rule' C" of the Maritime Law allowing for arrest, "in rem", upon default. Owner agrees to be responsible for all costs of this procedure, including but not limited to, attorneys fees, Marshal fees, Substitute Custodian fees, filing fees, and court costs.

### NOTICE

For all purposes of this Agreement, notice shall be deemed sufficient if delivered in writing by facsimile or overnight courier to one to the other at the following addresses:

| | |
|---|---|
| Address of Shipyard: | PALMER JOHNSON SAVANNAH, INC.<br>3124 River Drive<br>Savannah, Georgia    31404<br>Fax: (912) 354-8621 |
| With a copy to: | Kurt E. Bosshardt, Esq.<br>Kurt Bosshardt & Associates, P.A.<br>1600 S.E. 17th Street, Suite 405<br>Ft. Lauderdale, Florida  33316<br>Fax: (954) 764-8176 |

n:\sr.ionianprincess agrmnt-rev 04.26.01

- 8 -

Address of Owner:      M H YACHT SALES, INC.
                         15750 South Harlem Avenue
                         Suite 28
                         Orland Park, Illinois   60462
                         Fax: (708) 429-9972

With a copy to:        Robb R. Maass, Esq.
                         Alley, Maass, Rogers & Lindsay, P.A.
                         321 Royal Poinciana Plaza
                         Palm Beach, Florida  33480
                         Fax: (561) 833-2261

## HEADINGS

The headings of the articles of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

## LIMITATIONS OF OWNER' S REMEDY

Except as provided in the LIMITED WARRANTY section of this Agreement, it is understood and agreed by Owner that all incidental and consequential damages are excluded from this Agreement as they pertain to commercial law.

## DISPUTES

Venue and jurisdiction for enforcement of any provision of this Agreement shall be exclusively within Chatham County, Georgia.  The laws of the State of Georgia shall govern.

## ARBITRATION

The parties shall submit to arbitration any dispute arising from this Agreement.  Either party may initiate arbitration by sending written notice to the other of election of the right of arbitration and specifying the dispute to be arbitrated.

The parties shall request Bob Connell of Patton Marine, Inc. to serve as arbitrator.  If, for any reason, Bob Connell is unable or unwilling to serve, the parties shall request H.M. "Butch" Pliske of Pliske Marine, Inc. to act in his stead.  If H.M. "Butch" Pliske is unable or unwilling to serve, each party shall immediately appoint an arbitrator, and within five (5) days thereafter the two appointed arbitrators shall select a third arbitrator.  All arbitrators shall be impartial and unrelated, directly or indirectly related to the parties. The arbitrators shall have substantial knowledge and experience in matters related to vessel construction.

n\:sr.ionianprincess agrmnt-rev 04.26.01

-9-

The arbitrator(s) shall hold hearings at which the parties may present evidence and arguments, be represented by counsel, and conduct cross examination. All arbitration hearings shall be held at a place designated by the arbitrator(s) in Chatham County, Georgia. The arbitrator(s) shall use their best efforts commence the first such hearing within (10) days of appointment and to render a written decision upon the matter presented (by a majority vote, in the case of three arbitrators) within five (5) days after conclusion of the hearings, and that decision shall be final and binding on the parties. The parties and the arbitrator(s) shall use their best efforts to conclude the hearing within ten (10) business days; no continuance shall be granted by the arbitrator(s) without the agreement of all parties.

The arbitrator(s) selected hereunder shall agree to observe the Code of Ethics for Arbitrators in Commercial Disputes promulgated by the American Arbitration Association ("AAA") and the American Bar Association, or any successor code. Except as set forth herein, or as unanimously agreed by the arbitrator(s), the arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the AAA. If necessary, the parties shall advance on an equal basis any costs of the arbitration, such as reporter's fees and arbitrator(s) fees. The prevailing party shall be entitled to recover as part of the award all such advanced costs and reasonable, attorney's fees and related costs, including expert witness fees and costs, and any other reasonable costs, fees, or expenses of the arbitration. In the event of any dispute over any such fees and costs, each party m ay apply to the arbitrator(s) within thirty (30) days of the award on the merits for entry of an award of fees and costs without a hearing, but with consideration of any factual material or brief submitted by the parties, and such award shall be paid within thirty (30) days from the date of such award.

No party shall be considered in default hereunder during the pendency of arbitration proceedings relating to a disputed default, and if found in default by the arbitrator(s), shall be given ten (10) days from receipt of the arbitration award to cure such default.

## CONTROL - AGREEMENT OVER SPECIFICATIONS

In case of conflict, the following shall apply:

      1 .    The Agreement shall control first;

      2.    The Scope of Work and Specifications shall govern second.

## ENTIRE AGREEMENT

This Agreement, consisting of Exhibits attached hereto and incorporated by reference herein, constitutes the entire agreement between Shipyard and Owner, and supersedes any prior agreements and representations, written or oral, which may have been entered into between the parties. The parties hereby acknowledge this Agreement can be

n\:sr.ionianprincess agrmnt-rev 04.26.01

- 10 -

modified only by mutual written consent Furthermore, Shipyard and Owner agree this Agreement shall become effective upon execution by both parties.

**IN WITNESS WHEREOF,** Shipyard and Owner do hereby accept the conditions as set forth herein and have hereunto set their hands and seals, in duplicate, the day and year first above written.

WITNESS

WITNESS

PALMER JOHNSON SAVANNAH, INC.

OWNER/OWNER'S REPRESENTATIVE

n:\sr.ionianprincess agrmnt-rev 04.26.01

- 11 -

# EXHIBIT 3

# IONIAN PRINCESS

**May 27, 2003**

**Skip Robinson**
**Palmer Johnson, Savannah.**

Dear Skip,
Attached e-mail received today from our insurance company.
Please let me know what I should reply as far as paragraph 3 is concerned.

- The concerns of the Insurance Company are appropriate due to Hurricane Season commencement.
- Security measures are not in place. I can say are very slack. (Tent is open, materials missing everyday, etc)

Taking this opportunity I like to remind you that I and my crew should be kept harmless from any financial and or contractual disputes between contracted parties for ship's completion. We have been contracted by the Owners as per the International Convention STCW 1978 as Amended 1995 accepted/approved by US Coast Guard, no matter of ship's flag and crew nationality. Since we are complete satisfied, as far as our contract is concerned, we shall continue serving the ship and our obligations against the Authorities and the yard and we shall always guard the security of the ship and surrounding installation.

Sincerely

Captain Manos E. Vernicos

*Note: This is Captain's direct communication, not dictated, suggested or imposed by others.*

**VIA HAND DELIVERY**

May 29, 2003

Captain Manos Vernicos
M/Y IONIAN PRINCESS

Re:    Security and Hurricane Preparedness

Dear Captain Vernicos:

Responding to your hand delivered letter of May 25th and sensitive to the concerns that you present in that letter we are accelerating our normal hurricane plan, which we do not usually put into effect until later in the season. But to address your concerns we will remove the fabric cover from the metal framing, which is the practice that we take to prevent damage from high winds since the metal framing itself offers little resistance and is not likely to be damaged during a hurricane or cause damage to the yacht.

To address your concern about security, we will revisit the yacht and be certain that all openings are properly secure and then place a second lock next to the locks currently on the boat. We will keep a key to our lock and give you the key that we now have to your lock. In this way we will ensure that neither members of our company nor members of the crew can board without appropriate notice to the other. This will prevent the possibility of mysterious disappearance.

We appreciate your concerns and continue cooperation and while we do not believe we have a bailment responsibility we will take every reasonable effort to ensure the safety of IONIAN PRINCESS.

Best regards,

Skip Robinson, Vice President & General Manager
PALMER JOHNSON SAVANNAH, INC.

SR/sfs

Cc:    Tim Mohamed
       Wiley Ellis

# EXHIBIT 4

# IONIAN PRINCESS

**June 6, 2003**

**Skip Robinson**
**Palmer Johnson Savannah, Inc.**

**Re Security and Hurricane Preparedness**

Dear Skip,

Yesterday I received your letter of May 29th
In my note of May 27, I was asking you to give me a written preparedness plan like the one you had issue last year. This is what our insurance company requires.
I do not agree to uncover the boat before any Hurricane Alert because she is not prepared against heat (Sun), as well she is not prepared watertight (Doors, Hatches Windows, Vents and ships cable installation on Sun-deck).
The second lock is absolutely to your discretion because since we change the padlocks and moved our materials we are not loosing them any more. In any case we should have access to your keys (if you place a second lock) because we (the crew) are working every day on board including Saturday Some times on Sunday (if the weather is bad).
Be sure that we do care not only for the boat but the surrounding area as well. If something goes wrong we advise immediately your competent officer and the security. Thank you very much for the cooperation and do not hesitate to call me at any time any day, we are standing-by for any assistance and cooperation.

Best Regards

Capt Manos Vernicos



## PALMER JOHNSON
### *Savannah*

**VIA HAND DELIVERY**

June 20, 2003

Captain Manos Vernicos
M/Y IONIAN PRINCESS

Re:    Security and Hurricane Preparedness

Dear Captain Vernicos:

We are in receipt of your letter dated June 6, 2003 in which you request that we keep the cover on the framework, contrary to our earlier understanding.

As per your request please find the Hurricane Preparedness information that we have updated for the 2003 season.

If there are additional questions please contact me.

Best regards,

Skip Robinson, Vice President & General Manager
PALMER JOHNSON SAVANNAH, LLC

SR/sfs

Cc:    Ruth Seese

EXHIBIT 5

FROM :                              PHONE NO. : 912 239 1147          Jul. 08 2003 03:36PM P5

# PALMER JOHNSON SAVANNAH, LLC
## Hurricane Preparedness Plan
**Submitted by:**
**Department of Safety and Environment**
**April 2003**

## INTRODUCTION:

The potential destructiveness of hurricanes poses a serious threat to the coastal areas of the United States. Although the Georgia coast has not been directly struck by any category 3-5 hurricanes this century, the possibility of such an occurrence is not remote. It is essential that management and employees be informed of the potential of property damage posed by a severe hurricane as well as the actions they should take to safeguard property and avoid environmental catastrophe.

## PURPOSE:

This is a comprehensive plan of action through which Palmer Johnson Savannah has prepared for the threat and destructive impact of a hurricane. The purpose of this plan is to serve as a guide for the management and staff of Palmer Johnson Savannah to ensure effective preparedness in conjunction with local, state and federal plans and procedures. This plan sets forth actions to be taken to protect property; evacuation of customers/clients and actions to mitigate damage after a storm has passed. Operational actions and decisions during a potential hurricane will be based on the forecast intensity of the storm, likelihood of hurricane conditions and the lead-time available for preparedness activity.

This plan assumes that preparedness, warning, and protection operations will be initiated at management level utilizing all available resources to assure effective response. This plan is based on the following specific guidelines:

1. Executive decision makers will be well acquainted with the plan and will act decisively when circumstances warrant. Therefore, prioritization of response efforts is critical.
2. All parties with roles and responsibilities for preparedness, response and recovery will maintain a state of readiness throughout hurricane season. They will actively participate in preparation when called upon to do so and will work collectively in a spirit of teamwork, as circumstances require.
3. Management of Palmer Johnson Savannah will follow instructions from local emergency management agencies and take appropriate action when necessary.
4. Sufficient lead-time will be given to implement this plan and mobilize available resources assuming a hurricane watch will be issued 36 hours before expected landfall and/or a hurricane warning 24 hours prior.

## SCOPE AND IMPLEMENTATION:

Upon recommendation of the Emergency Planning Committee (EPC) and the Chatham Emergency Management Agency (CEMA), advisory emergency operations shall commence at the direction of the Vice President, or his/her designated representative. The extent of emergency operations conducted, including property protection and evacuation, will depend on the magnitude, track and timing of the storm. Early alerting of department heads to emergency operation responsibilities is essential. Increased readiness and mobilization will be initiated progressively as the threat increases.

## OPERATING CONDITIONS:

Hurricanes tend to develop more slowly than most natural disaster threats. Therefore, Palmer Johnson Savannah has the opportunity to systematically mobilize and apply resources. In order

to control and coordinate these efforts within the company, various levels of readiness have been established. The Georgia Hurricane Plan specifies the minimum time frames and preparedness related activities for each level. This hurricane preparedness plan is consistent with these minimums.

## RESPONSIBILITY:

The Department of Safety and Environment will maintain liaison with local authorities and Emergency Management agencies to insure this Hurricane Preparedness Plan meets guidelines as a "living document" necessary to respond to threats of hurricane related conditions.

## REVIEW:

The company Safety/Security Officer will be responsible for the amending of the plan to insure current standards are met. The Hurricane Preparedness Plan will be reviewed annually In March and/or April of each year and updated as needed.

## IMPLEMENTATION TIMING:

The practical decision point, or deadline to initiate this plan will be based on the probability that a storm will or can make landfall, or at least pass close enough to endanger lives and/or property. Probabilities are expressed as percentages around the official forecast track of a storm up to 72 hours or more into the future. They are provided by the National Weather Service (NWS) every six hours and are useful in assessing a potential threat. The Emergency Planning Committee will have to agree on a minimum threshold level to begin emergency planning operations. Ideally, consensus will be reached in advance of the decision point so preparations can be made in time to satisfy clearance requirements.

The maximum theoretical probabilities for a direct storm strike are:

| PROBABILITY | HOURS BEFORE LANDFALL |
|---|---|
| 10% | 72 |
| 13-18% | 48 |
| 20-25% | 36 |
| 35-45% | 24 |
| 60-70% | 12 |

It is unlikely that the probability of a strike will ever exceed a 25-35% probability in order to complete preparations in a timely manner. Therefore, any action must be started while uncertainty is 10%-15%. Delaying a decision to incorporate preparedness activities until the probability is 50-50 will be too late, even for a category 1 or 2 storm.

## LEVELS OF PREPAREDNESS:

**Pre Season**

Level 1-**Beginning of hurricane season (06/01-11/30)**
At the beginning of hurricane season the Emergency Planning Committee will meet to review, plan and make corrections, additions and update the plan as needed.

Level 2-**Hurricane season begins (06/01)**
All departments maintain routine operations with an emphasis on preparing their area for possible readiness. Minimum inventory levels required for protection of property will be determined and filled. The Dock Master will keep abreast of The National Weather Service positioning.

Level 3-**A Tropical Storm or Hurricane has developed and could pose a threat to Georgia. Expected landfall 48-72 hours.**

4

The Dock Master will notify the Safety and Environment Office, who in turn will notify the Emergency Planning Committee and set up meetings. The Dock Master will provide updates as issued by The National Weather Service. The EPC will meet with foreman to inform them of impending implementation of the plan. If additional boarding and other supplies are required, they will be ordered at this time.

## Level 4-Hurricane/Tropical Storm Watch. Expected landfall 24-36 hours.

### If the storm is identified as a category 1 or 2:

1. All boat owners/captains will be notified by the Dockmaster and proper securing of vessels will commence by the Dock Protection Teams.
2. Any windows and exposed glass will be taped or boarded by the Physical Yard Protection Teams.
3. All computer systems will be backed up by the Records Protection Team.
4. Any material, which can pose as a missile hazard, will be moved indoors or secured appropriately by the Yard Equipment Teams.
5. The Vice President will authorize any and all evacuation from Palmer Johnson Savannah facilities when preparation is complete, not to exceed 12 hours from landfall.

### If the storm is identified as a category 3-5:
### (A watch is called)

1. All incoming traffic will be restricted to essential personnel by Security.
2. Dockmaster will notify all boat owners/captains of possible strike and advise to leave.
3. All yard equipment will be secured by the Yard Equipment Teams.
4. The Physical Yard Protection Teams will disassemble and secure all scaffolding.
5. All Stockroom and Purchasing staff will elevate all stock. All purchasing records will be transferred to

the second floor of building 202 by the Records Protection Team.

6. Floating docks and bulkheads will be secured by the Boat and Dock Protection Teams.

7. The Emergency Planning Committee will maintain contact with CEMA for warnings/evacuation guidelines and prepare to evacuate yard personnel.

All preparation activities will be completed at least 12 hours before predicted landfall.  In the event a warning is declared (landfall expected within 12 hours) all yard personnel will be asked to leave.  Power to the yard will be disconnected and all natural gas into the yard will be disconnected by Yard Utility Protection Team.  All electronic records shall be placed on tape and taken off site as warrants.  Additionally, two (2) tapes will be stored off site.  (one mailed to Florida and one mailed to England)  All paper records, personal and financial, will be stored in a vault.

## POST STORM:

Upon the all clear being issued by government agencies, all yard personnel will report as soon as possible to assist in assessment of the damage.  The Emergency Planning Committee will coordinate assessment activities and recommend to the Vice President a plan of action for mitigation of damage.

## DEFINITION OF TERMS

**Potential Threat-** Condition when tropical storm or hurricane force winds  are expected within 36-72 hours.

**Hurricane Watch-**Condition when hurricane force winds are expected within 24-36 hours.

**Hurricane Warning-**Condition when hurricane force winds are expected  within 24 hours.

**Hurricane Season-**June 1-November 30

**NWS** - National Weather Service.  Predicts projected path and weather conditions of hurricanes.

**CEMA** - Chatham Emergency Management Agency.  Coordinates all disaster preparedness activities in Chatham County.

**EPC** - An Emergency Planning Committee will be formed on site at Palmer Johnson Savannah and is composed of the following personnel:

1. Dock Master
2. Director of Administration
3. Director of Production
4. Director of Yacht Services
5. Personnel Manager
6. Safety and Environmental Manager
7. Controller

Duties of the Emergency Planning Committee shall include but are not limited to:

1. Update and revise Emergency Operation Plan as needed.
2. Advise the Vice President who will act as Incident Commander.
3. Assess the situation and determine the correct course of action.
4. Implement the Emergency Operation Plan.
5. Determine response strategies.
6. Activate and insure resources available.
7. Assign Reaction Teams as needed.

## REACTION TEAM:

In the event the Emergency Operation Plan is implemented, five (5) reaction teams will be organized.  Team leaders will have training annually prior to season. Staffing of teams will be assigned based upon available manpower and preparedness level required. These teams will be directed by:

1. **Yard Equipment Protection-** To secure all yard equipment (included but not limited to; temporary structures, ladders, scaffolds and motorized equipment.)

    **a.** North side Yard
           and                   Chuck Ward
    **b.** Southside Yard

2. **Physical Yard Protection-** Prepare facility by boarding or taping of exposed glass.   Security of all possible missile hazards.

    **a.** North side Yard
           and                   Gebel Seese
    **b.** Southside Yard

3. **Boat and Dock Protection-** Launch any vessels seaworthy (with owner/captain). ·Reasonably secure any vessels left in marina. Tape or board vessel windows.   Secure all floating docks and platforms. Assist in shutdown of all dock areas

    **a.** Marina and docks             Jed Brebner

4. **Records Protection-** Protects paper and electronic files and computer and financial records in connection with this plan. Directed by Ruth Seese.

5. **Yard Utility Protection-** Protects, prepares and disconnects Electric, Gas, Telephone and Radio service as needed. Directed by Mike Mulford.

# EXHIBIT 6

# ELLIS, PAINTER, RATTERREE & BART LLP

ATTORNEYS AT LAW
POST OFFICE BOX 9946
SAVANNAH, GEORGIA 31412-0146

TELEPHONE (912) 233-9700
FACSIMILE (912) 233-2281

OFFICES:
TENTH FLOOR
2 EAST BRYAN STREET
SAVANNAH, GEORGIA 31401-2602

J. WILEY ELLIS (GA & NC)
PAUL W. PAINTER, JR.
R. CLAY RATTERREE (GA & CO)
RANDALL K. BART (GA & FL)
CHRISTOPHER E. KLEIN
DAVID W. ADAMS
SARAH B. AKINS
JAMES K. AUSTIN
TRACY C. O'CONNELL
PAUL D. MEYER (GA & SC)
MAURY BOWEN ROTHSCHILD
DREW K. STUTZMAN
EDWARD L. NEWBERRY, JR.
ANSLEY BELL THRELKELD
AMY R. HENDERSON (GA & AL)
LORI E. T. LONCON

April 16, 2003

PAUL W. PAINTER, JR.
E-MAIL PPAINTER@EPRB-
LAW.COM

## VIA HAND DELIVERY

Frank W. Seiler, Esq.
Carleton E. Joyce, Esq.
Bouhan, Williams & Levy LLP
P. O. Box 2139
Savannah, GA 31402

RE:   M. H. Yacht Sales, Inc. v. Palmer Johnson Savannah, Inc.

Dear Sonny and Carleton:

We are replying to your letter of April 9 on behalf of Timur Mohamed and Palmer Johnson Savannah, LLC. We categorically deny that our clients have any responsibility for any alleged breach of the contract between M. H. Yacht Sales, Inc. and Palmer Johnson Savannah, Inc.

You have evidently been misinformed about the change in business owners. Palmer Johnson Savannah, LLC purchased the assets of Palmer Johnson Savannah, Inc. It paid a price for those assets that was clearly commensurate with their value. Neither Palmer Johnson Savannah, LLC nor Mr. Mohamad purchased any stock of Palmer Johnson Savannah, Inc. or any of its affiliated companies. Mr. Mohamed is the sole member of Palmer Johnson Savannah, LLC, in which none of the shareholders of Palmer Johnson Savannah, Inc. or its affiliated companies has any ownership interest whatsoever.

Palmer Johnson Savannah, LLC is not a "continuation" of Palmer Johnson Savannah, Inc. under Georgia law and there are no facts that support such a contention. The facts you recite, that Palmer Johnson Savannah, LLC is carrying on the same business at the same location with a similar name, does not render it liable for the debts of Palmer Johnson Savannah, Inc. Moreover, Palmer Johnson Savannah, LLC most assuredly did not assume any liability for any alleged breaches by Palmer Johnson Savannah, Inc. of the contract between M. H. Yacht Sales, Inc. and Palmer Johnson Savannah, Inc.

Frank W. Seiler, Esq.
Carleton E. Joyce, Esq.
April 16, 2003, Page Two

The arms-length transaction between Palmer Johnson Savannah, Inc. and Palmer Johnson Savannah, LLC actually served to benefit your client significantly by causing the pay-off of various trade payables of Palmer Johnson Savannah, Inc., thereby extinguishing claims of materialmen and subcontractors who may otherwise have asserted liens against your client's boat. In addition, Palmer Johnson Savannah, LLC has kindly offered to provide services to your client with regard to work on the *Ionian Princess* at what is essentially a break-even price for our client, an offer that would allow your client to keep the boat in Savannah rather than having to move the boat to another yard. While Palmer Johnson Savannah, LLC remains willing to enter into a contract directly with your client to perform work on the *Ionian Princess* despite your baseless accusations of misconduct by Mr. Mohamed, Palmer Johnson Savannah, LLC will do so only if your client agrees to a separate and distinct contract that is acceptable to Palmer Johnson Savannah, LLC.

Your statement that Mr. Mohamed acted in concert with Mr. Andrew McKelvey to evade the corporate obligations of Palmer Johnson Savannah, Inc. is untrue and defamatory. Any legal action you commence against Mr. Mohamed would be frivolous and would be dealt with accordingly.

If your client wishes to engage in further negotiations with Palmer Johnson Savannah, LLC with regard to a contract for work on the *Ionian Princess,* please contact Wiley Ellis of this firm immediately. Otherwise, please arrange for the removal of the *Ionian Princess* from the Palmer Johnson Savannah, LLC premises within thirty days of the date of this letter. After the thirty day period concludes, Palmer Johnson Savannah, LLC will charge a storage fee of $3.00 per foot per day.

Very truly yours,

Paul W. Painter, Jr.
For the Firm

PWPjr:ask

cc:    J. Wiley Ellis, Esq.

ELLIS, PAINTER, RATTERREE & BART LLP

# EXHIBIT 7. a.



07/17/2003

# EXHIBIT 7. b.



# EXHIBIT 7. c.



# EXHIBIT 7. d.



# EXHIBIT 7. e.



07/17/2003

# EXHIBIT 7. f.

# EXHIBIT 7. g.



07/17/2003

# EXHIBIT 7. h.



07/17/2003

# EXHIBIT 7. i.



# EXHIBIT 7. j.



07/17/2003

# EXHIBIT 7. k.



# EXHIBIT 7. I.



# EXHIBIT 7. m.



# EXHIBIT 7. n.





07/17/2003

# EXHIBIT 7. o.



07/17/2003

# EXHIBIT 7. p.



# EXHIBIT 7. q.



# EXHIBIT 7. r.



07/17/2003

# EXHIBIT 7. s.



# EXHIBIT 7. t.



# EXHIBIT 7. u.



# EXHIBIT 7. v.



# EXHIBIT 7. w.



# EXHIBIT 7. x.



# EXHIBIT 7. y.



07/17/2003

# EXHIBIT 7. z.



# EXHIBIT 7. aa.



07/17/2003

# EXHIBIT 7. bb.



# EXHIBIT 7. cc.



# EXHIBIT 7. dd.



# EXHIBIT 7. ee.



07/17/2003

# EXHIBIT  B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

M. H. YACHT SALES, INC.,                    )
                                            )
        Plaintiff,                      )
                                            )
v.                                          )    CIVIL ACTION NO. CV403-115
                                            )
PALMER JOHNSON SAVANNAH, LLC,               )
                                            )
        Defendant.                      )

## AFFIDAVIT OF J. WILEY ELLIS

PERSONALLY APPEARED before the undersigned officer, duly authorized to administer oaths, J. WILEY ELLIS, who being duly sworn, deposes and says that:

1.    He is an attorney at law admitted to practice in the State of Georgia, and has personal knowledge of the facts in this affidavit.

2.    He is a partner in the law firm of Ellis, Painter, Ratterree & Bart LLP, Savannah, Georgia.

3.    He represents Palmer Johnson Savannah, LLC (the "LLC"), a Georgia limited liability company, whose sole Member is Timur Mohamed.

4.    He, along with his associate, Maury B. Rothschild, represented the LLC in the negotiation, execution and closing of that certain Asset Purchase Agreement, dated as of February 28, 2003, among Palmer Johnson Acquisition Corporation, Palmer Johnson Savannah, Inc., Andrew McKelvey, Palmer Johnson, LLC and Timur Mohamed (the

"APA"). Palmer Johnson Savannah, Inc. was identified as the "Seller" in the first page of the APA and Palmer Johnson Savannah, LLC was identified as the "Buyer."

5. The APA was signed (like most "sales" contracts) prior to the "closing" of the agreement. One of the documents that comprised the APA was Schedule 2.1(e), which listed the "Seller Contracts," i.e., contracts of Palmer Johnson Savannah, Inc. that had a value of $25,000 or more. See APA paragraph 2.1(e). Schedule 2.1(e), which was supplied by counsel for Palmer Johnson Savannah, Inc., was a list of the then "Current Contracts" of Palmer Johnson Savannah, Inc. as shown at the top left corner of the first page of the schedule on which contracts are listed. When Schedule 2.1(e) was attached to the APA, prior to closing, the *Ionian Princess* contract was one of the "Current Contracts" listed. However, it was the obvious intent of the parties, as evidenced by specific language of the APA, that Palmer Johnson Savannah, LLC would not choose, until <u>after</u> the closing had occurred, whether it would assume the *Ionian Princess* contract. This intent of the parties is shown in APA paragraph 2.5(b)(xix), which provides that the Seller, Palmer Johnson Savannah, Inc., would retain "any liability for performance under the contract relating to the yacht known as the 'Ionian Princess,' except that Buyer, at the Buyer's election in the Buyer's sole discretion, may choose <u>after the Closing</u> to assume the obligation for performance under the contract relating to the 'Ionian Princess,' in which case Seller <u>will assign</u> said contract to the Buyer." (underlining added).

6. The APA was dated as of February 28, 2003. Section 2.7 of the APA called for a future "Closing Date" on March 4, 2003, unless the parties otherwise agreed. The parties agreed to individually execute the documents needed to close the transaction,

instead of gathering at one location to execute them, and to exchange the signature pages by facsimile and by overnight delivery.

7.     The closing documents, which consisted of the following documents, were executed as of March 4, 2003:  General Warranty Bill of Sale, Assignment and Assumption Agreement, Sublease and Indemnification Agreement, and Protocol of Delivery and Acceptance.  These agreements were intended to be effective contemporaneously with the closing of the transaction and not "after" the Closing.

8.     The wire transfer of the final purchase price, $1,650,000, was accomplished several days after March 4, 2003.  Moreover, Andrew McKelvey, sole director of Palmer Johnson Savannah, Inc., and Timur Mohamed entered into a Closing Agreement dated March 10, 2003 to memorialize certain agreements made in association with the closing of the transaction.  Even though these actions took place after March 4, 2003, the parties intended for the Closing to be deemed to have occurred as of March 4, 2003.

9.     Palmer Johnson Savannah, Inc. and Palmer Johnson Savannah, LLC entered into an "Assignment and Assumption Agreement" contemporaneously with the Closing on March 4, 2003.  Although that document  references Schedule 2.1(e), the parties did not intend for it to address or to deal with the *Ionian Princess* contract.  The LLC (the Buyer) did not elect after the Closing to assume the obligation for the *Ionian Princess* contract, and the Seller did not execute any assignment of the *Ionian Princess* contract to the LLC after the Closing.

10.     The actions of the LLC after the Closing did not indicate that it ever assumed the obligations under the *Ionian Princess*  contract.  After the Closing, the LLC took over

- 3 -

the repair yard at the Thunderbolt, Georgia facility where the *Ionian Princess* was located, and the LLC agreed to perform certain work on the *Ionian Princess*, but only as a contractor of the Seller, during which time the LLC attempted, unsuccessfully, to negotiate a contract with M. H. Yacht Sales to complete the construction of the *Ionian Princess*.

11.    On March 17, 2003 (9:37 AM), which was after the Closing, Philip Friedman, President of Palmer Johnson Savannah, Inc., whose e-mail address is Plfmail@cs.com, transmitted an e-mail to M. Gregg (Skip) Robinson, Vice President of Palmer Johnson Savannah, LLC (whose e-mail address is skip@pjsavannah.com) with a copy to Timur Mohamed, the sole member of  Palmer Johnson Savannah, LLC (whose e-mail address is tim@noblesea.freeserve.co.uk) in which Mr. Friedman described the fact that Palmer Johnson Savannah, LLC only assumed the receivable of the *Ionian Princess*, and that Palmer Johnson Savannah, LLC was performing work on the *Ionian Princess* as a contractor to Palmer Johnson Savannah, Inc.  An accurate copy of Mr. Friedman's e-mail of March 17, 2003 (9:37 AM) is attached hereto as Exhibit 1.

12.    On March 17, 2003 (4:37 PM), Philip Friedman, President of Savannah Yacht Corp., transmitted another e-mail to M. Gregg (Skip) Robinson, in which Mr. Friedman said again  that Palmer Johnson Savannah, LLC was to bill Palmer Johnson Savannah, Inc. as a subcontractor for work on the *Ionian Princess*.  An accurate copy of Mr. Friedman's second e-mail of March 17, 2003 (4:37 PM) is attached hereto as Exhibit 2.

13.    On April 7, 2003, Philip Friedman transmitted an e-mail to  Chris Rouse, attorney for Palmer Johnson Savannah, LLC, in which he stated specifically that the LLC

did not assume the *Ionian Princess* contract.  Mr. Friedman sent a copy of this e-mail

electronically to affiant, whose e-mail address is wellis@eprb-law.com.  An accurate copy

of Mr. Friedman's e-mail of April 7, 2003 is attached hereto as Exhibit 3.

14.    Accurate copies of pertinent pages from the APA referenced in this affidavit

are attached hereto as Exhibit 4.


_____

J. Wiley Ellis

Sworn to and subscribed before
me this 21st day of July, 2003.

Notary Public, Chatham County,
Georgia

PATRICIA I. ALEXANDER
Notary Public, Chatham County, GA
My Commission Expires August 22, 2004

# EXHIBIT  1

## Skip Robinson

| | |
|---|---|
| **From:** | Plfmail@cs.com |
| **Sent:** | Monday, March 17, 2003 9:37 AM |
| **To:** | skip@pjsavannah.com |
| **Cc:** | tim@noblesea.freeserve.co.uk |
| **Subject:** | Re: : IONIAN PRINCESS Contract and Arbitration |
| **Follow Up Flag:** | Follow up |
| **Due By:** | Friday, May 30, 2003 12:00 AM |
| **Flag Status:** | Flagged |

Skip,

It is possible, and the PJS asset deal was structured so that PJS LLC took assignment of the receivable without accepting assignment of the contract. This is like selling "the paper."

Assuming that the IP debt to PJS Inc. is legitimate, PJS LLC can collect, like any assignee of a debt. There is, however, a principle in law to the effect that the holder in due course of a debt cannot be in a position improved over the original holder of the debt. That is, if there are offsets, counterclaims, etc. against the original holder of the debt (PJS Inc.), then the holder in due course (PJS LLC) is still subject to those offsets, counterclaims, etc., at least to the extent of the debt that it is trying to collect.

This is why I wanted to keep this out of arbitration for the time being, and why I wanted to restart work for the next couple of weeks on a cover-the-payroll basis -- namely to allow sufficient time to compile and evaluate the detail that we would potentially be taking into arbitration. And to allow some more time to negotiate a settlement with Halikias.

Robb Maass is aware of the difficulty they will have in attempting to enforce the completion of the contract under its original terms, i.e., he asked me whether, if a settlement going forward could be achieved, a new contract could be drawn with PJS LLC. But this does not affect their defense on refusal to pay the $900K due now.

They will no doubt argue that PJS Inc. no longer has the capability of performing on the contract., and is therefore in default.

OUR RESPONSE TO THIS, WHICH OUR CURRENT PAPERWORK SHOULD REFLECT, IS THAT PJS LLC IS SUBCONTRACTING WITH PJS INC. FOR THE COMPLETION OF THE WORK. This establishes that PJS Inc. has the ability to continue to perform, without making PJS LLC directly responsible to Halikias for the remainder of the contract.

I believe that they want to achieve a settlement; and that the best way to approach it is on a break even basis going forward.

The first step in all of this is to clearly and as accurately as possible identify the costs to completion from this point forward. Concurrent with that we need to have all of the documentation in regard to how Halikias's requirements have changed and reached beyond the scope of the original contract and any change orders already negotiated and signed.

Best. Phil

# EXHIBIT  2

## Skip Robinson

| | |
|---|---|
| **From:** | Plfmail@cs.com |
| **Sent:** | Monday, March 17, 2003 4:37 PM |
| **To:** | skip@pjsavannah.com |
| **Cc:** | tim@noblesea.freeserve.co.uk |
| **Subject:** | Re: : IONIAN PRINCESS Contract and Arbitration |
| **Follow Up Flag:** | Follow up |
| **Due By:** | Friday, May 30, 2003 12:00 AM |
| **Flag Status:** | Flagged |

Skip,

My recommendation is to continue the billing by PJ Savannah Inc. (with sub-contract payments passing through dollar for dollar to PJS LLC), to avoid creating any new obligations of the part of PJS LLC. Later, if a settlement can be reached, a new contract can be drawn with PJS LLC.

Best. Phil

# EXHIBIT  3

**Wiley Ellis**

| | |
|---|---|
| **From:** | Plfmail@cs.com |
| **Sent:** | Monday, April 07, 2003 5:05 PM |
| **To:** | chrisrouse@lawsavannah.com |
| **Cc:** | wellis@eprb-law.com; timur@noblesea.freeserve.co.uk; RoxP@aol.com; |

**Subject:** Halikias vs. Palmer Johnson Savannah Inc.

Chris,

As part of the PJ Savannah APA, PJ Savannah LLC received assignment of the approximately $900K receivable on Ionian Princess (Halikias), although it did not assume the contract between Halikias and PJ Sav Inc.

My understanding is that Skip Robinson, who is now employed by and represents PJ Sav LLC, and Tim Mohamed, owner of PJ Sav LLC, met with Mr. Halikias recently. Halikias alleges that he was told that PJ Savannah Inc. could not, and moreover would not, meet its obligations under his contract with it.

A few weeks prior to Halikias alleged meeting with PJ Sav LLC, I met with Halikias and his lawyer, Robb Maass. At that time, my expressed position was that PJ Sav Inc. would meet its obligations under the contract, the question being what those obligations actually are and to what extent had actions by Halikias and his representatives modified the original contract. When asked how PJ Sav Inc. could complete the work under the contract as it no longer operated the boatyard, my response was that I anticipated that PJ Sav Inc. would sub-contract completion of the work with PJ Sav LLC, the current operator of the boatyard.

As I saw it, and continue to see it, any other position puts PJ Sav Inc. in at least anticipatory, if not current breach of the contract.

Now comes the alleged statements of PJ Sav LLC, which can cause problems for PJ Sav Inc. (now Savannah Yacht Corp.). I do not know what, if any, action needs to be taken at this time, other than to caution PJ Sav LLC from making precipitous statements to Halikias which may ultimately damage PJ Sav Inc. and which may push Halikias into costly litigation when it might otherwise be avoided.

Please advise as to your opinion on this. Also, please be aware of the fact that it appears that the interests of Pj Sav Inc. (your client) and those of PJ Sav LLC in this matter may not at this time coincide. And finally, that you instructions in this and other matters should, at this point forward, only be accepted from me or other authorized agent(s) of PJ Savannah Inc.

Best regards,

Phil Friedman

# EXHIBIT  4

# Schedule 2.1(e)

# List of Acquired Assets consisting of Seller Contracts

See attached.

.

**Palmer Johnson Savannah, Thunderbolt**
**Current Contracts**

| | Name | Contact Info | Value | Project Dates | Status |
|---|---|---|---|---|---|
| - | *Ionian Princess* | MH Yacht Sales<br>17750 S Harlem Ave<br>Suite 25<br>Orland Park, IL  60462 | $5,674,000.00 | 3/01 - 7/03 | Contract |
| - | *PJS 102* | Francisco Brun Ramos<br>Embotelladora De Colima<br>C.P. 28000 Coilma, Dol.<br>Mexico | $6,854,000.00 | 12/01 - 6/03 | Contract |
| - | *Royal Eagle* | Cohen | $335,000.00 | 9/30/02 - 2/24/03 | T & M |
| - | *Project Blue/Unity* | PJSB 235 | $730,000.00 | 11/15/02 - 3/30/03 | Not confirmed |
| - | *Bill Collector* | Harry Scott<br>#8 Wexford Club Drive<br>Hilton Head, SC  29928 | $95,000.00 | 01/03/03 - 02/25/03 | Quote |
| - | *Patricia* | Patricia Marine | $285,000.00 | 01/06/03 - 02/22/03 | Quote / T&M |
| - | *Mostro* | Andy McKelvey | $45,000.00 | 01/09/03 - 02/20/03 | Quote / T&M |
| - | *Lady M* | Jack Moran<br>710 Greens Newberry Estate<br>Dallas, PA  18612 | $430,000.00 | 02/03 - 04/03 | Quote |
| - | *Jagare* | Jagare Shipping Ltd<br>24 Blvd Princess Charlotte<br>Monaco | $500 - $650,000 | | Not confirmed |
| - | *Kanaloa* | Mr. James Vincent<br>C/O Bob Saxon Assoc<br>801 Seabreeze Blvd<br>Ft. Lauderdale, FL  33316 | | 3/12/03 - 04/08/03 | Not estimated |
| - | *Inevitable* | Inevitable Yachts<br>Richard F. Hull<br>2150 South Andrews<br>Ft. Lauderdale, FL  33316 | | 4/5/03 - 4/30/03 | Not estimated |
| - | *Tamsen* | Windrose Shipping Ltd<br>5383 Hollister<br>Suite 230<br>Santa Barbra, CA  93111 | $75,000.00 | 1/30/03 - 04/03/03 | T & M |
| - | *Lara* | Lara Shipping Ltd<br>5383 Hollister | $275,000.00 | 1/30/03 - 4/16/03 | T & M |

**Palmer Johnson Savannah, Thunderbolt**
**Current Contracts**

|   |   |   |   |   |   |
|---|---|---|---|---|---|
| | | Suite 230<br>Santa Barbra, CA 93111 | | | |
| - | *Blue Moon II* | Blue Moon Corp<br>65 Spring Creek Road<br>Barrington Hills, IL 60010 | $150,000.00<br><br>$500,000 | 2/17/03 - 5/31/03<br><br>Phase II | Phase I<br><br>Not confirmed |
| - | *Gitana* | Gitana, Ltd<br>Simmonds Building<br>30 DeCastro St<br>Roadtown, Tortola BVI | | 02/22/03 - 03/15/03 | Not estimated |
| - | *Anamcara* | Salvatore' Trifiro | $60,000.00 | 3/03 - 4/03 | Quote |
| - | *Mamamouchi* | Mamamouch, Ltd<br>P.O. Box 71<br>Roadtown, Tortola BVI | $200,000.00 | 3/03 - 6/03 | Quote |
| - | *Kaori* | GG Operating<br>P.O. Box 1417<br>Greenville, SC 29602 | | 4/01/03 - 5/01/03 | Not estimated |
| - | *My Marzy* | John A. Boll<br>100 Maple Park Blvd<br>Suite 118<br>St. Claire Shores, MI 48081 | | | Not estimated |
| - | *Kiss the Sky* | C/O Camper Nicholson<br>801 Seabreeze Blvd<br>Ft. Lauderdale, FL 33316 | | 04/17/03 - 05/21/03 | Not estimated |

"from" means "from and including" and "to" means "to but excluding"; and

(x)    references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(b)    Accounting Terms and Determinations. Unless otherwise specified herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with GAAP.

(c)    Legal Representation of the Parties. This Agreement was negotiated by the parties with the benefit of legal representation, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party shall not apply to any construction or interpretation hereof.

## 2. Sale and Transfer of Acquired Assets; Closing

## 2.1 ACQUIRED ASSETS

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, but effective as of the Effective Time, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Seller, free and clear of any Encumbrances other than Permitted Encumbrances, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Assets):

(a)    that Lease Agreement attached hereto as Schedule 2.1(a);

(b)    all Tangible Personal Property, including those items described in Schedule 2.1(b);

(c)    all Materials, as listed on Schedule 2.1(c);

(d)    all Accounts Receivable, including the receivable relating to the yacht known as the "Ionian Princess";

(e)    the Seller Contracts with a value of under $25,000, and the Seller Contracts with a value of $25,000 or more which are listed on Schedule 2.1(e);

(f)    all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to Buyer, including those listed in Schedule 3.17(a);

(g)    all data and Records related to the operations of Seller, including client and customer lists and Records, referral sources, research and development reports  and Records, production reports and Records, service and warranty Records, equipment logs, operating guides and manuals, financial and accounting Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records and, subject to Legal Requirements, copies of all personnel Records;

(h)    RESERVED.

(i)    all insurance benefits, including rights and proceeds, arising from or relating to the Acquired Assets or the Assumed Liabilities prior to the Effective Time, unless expended in accordance with this Agreement;

(j)    all claims of Seller against third parties relating to the Acquired Assets, whether choate or inchoate, known or unknown, contingent or noncontingent, including all such claims listed in Schedule 2.1(j);

(k)    all rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof;

(l)    all of the Seller's current assets, including those listed on the Palmer Johnson Savannah, Inc. Balance Sheet (the most recent copy of which is attached at Schedule 2.1(l));

(m)    any lease agreement relating to the property leased by the Seller in Pooler, Georgia;

(n)    all historical and other existing design and engineering data, drawings, and other documents relating to estimating, bidding, costing, and managing refit and service, in Seller's possession or control, as well as all project planning and management software and other systems, and all accountings of the actual costs for construction of the yacht PJS102 and any other past and current new constructions and refits, including copies of all computer files related to the foregoing.

(o)     copies of all personnel Records and other Records that Seller has in its possession and is required by law to retain in its possession, but which Buyer reasonably requires for the retention of Seller's employees, the transfer and ongoing maintenance of employee benefits and other related plans, and all other operations of Buyer's businesses.

(p)     all rights in connection with and assets of the Employee Plans, except to the extent that the payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans are not current as of the Closing (except for a maximum of four weeks accrued but unpaid vacation per employee, and except for a maximum of four weeks accrued but unpaid sick leave per employee).

All of the property and assets to be transferred to Buyer hereunder are herein referred to collectively as the "Acquired Assets."

Notwithstanding the foregoing, the transfer of the Acquired Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Acquired Assets unless Buyer expressly assumes that Liability pursuant to Section 2.5(a).

## 2.2 RESERVED.

## 2.3 EXCLUDED ASSETS

Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following assets of Seller (collectively, the "Excluded Assets") are not part of the sale and purchase contemplated hereunder, are excluded from the Acquired Assets and shall remain the property of Seller after the Closing:

(a)     RESERVED.

(b)     all minute books, stock Records and corporate seals;

(c)     the shares of capital stock of Seller held in treasury, if any;

(d)     all insurance policies and rights thereunder (except to the extent specified in Section 2.1(i), (j) and (p));

(e)     any Seller Contracts not assumed in Section 2.1(e);

{135774 1}  005867-000001
Mohamed – PJ APA 2-28-03 FINAL {135774.1}.doc

(f)    RESERVED.

(g)    all claims for refund of Taxes and other governmental charges of whatever nature;

(h)    RESERVED.

(i)    all rights of Seller under this Agreement, the warranty Bill of Sale, the Assignment and Assumption Agreement; and

(j)    the property and assets expressly designated in Schedule2.3(j).

## 2.4 CONSIDERATION

The consideration for the Acquired Assets (the "Purchase Price") will be US $3,150,000.00 minus any reduction at closing for current liabilities as detailed in Section 2.9.

## 2.5 LIABILITIES

(a)    Assumed Liabilities. On the Closing Date, but effective as of the Effective Time, Buyer shall assume and agree to discharge only the following Liabilities of Seller (the "Assumed Liabilities"):

(i)    any trade account payable reflected on the Interim Balance Sheet (other than a trade account payable to any Shareholder or a Related Person of Seller or any Shareholder) that remains unpaid at as of the Effective Time;

(ii)    any trade account payable (other than a trade account payable to any Shareholder or a Related Person of Seller or any Shareholder) incurred by Seller in the Ordinary Course of Business between the date of the Interim Balance Sheet and the Effective Time that remains unpaid at as of the Effective Time;

(iii)    RESERVED.

(iv)    any Liability to Seller's customers under written warranty agreements given by Seller to its customers in the Ordinary Course of Business prior to the Effective Time (other than any Liability arising out of or relating to a Breach that

occurred prior to the Effective Time), except for an existing claim approximately in the amount of $900,000.00 outstanding against Palmer Johnson Inc. by Mr. Gaillard, the owner of "Lady Jenn," a yacht built by Palmer Johnson Inc. ;

(v)    any Liability arising after the Effective Time under the Seller Contracts described in Schedule 2.1(e) (other than any Liability arising under the Seller Contracts described on Schedule 2.5(a)(v) or arising out of or relating to a Breach that occurred prior to the Effective Time);

(vi)    any Liability of Seller arising after the Effective Time under any Seller Contract included in the Acquired Assets that is entered into by Seller after the date hereof and prior to the effective time in accordance with the provisions of this Agreement (other than any Liability arising out of or relating to a Breach that occurred prior to the Effective Time);

(vii)    any Liability of Seller described in Schedule2.5(a)(vii);

(vii)    the responsibility for completing the construction of the yacht known as "PJS 102."

(viii)    any Liability for any failure, alleged failure, of Buyer to comply with the WARN Act. after Closing;

(ix)    Liabilities under the Seller's self-insured health care insurance benefit plan for Seller's employees and former employees, but only to the extent of the Liabilities listed  in Schedule 3.15(o).

(b)    Retained Liabilities. The Retained Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Seller. "Retained Liabilities" shall mean every Liability of Seller other than the Assumed Liabilities, including:

(i)    except as provided herein, any Liability arising out of or relating to services rendered and products of Seller to the extent manufactured or sold prior to the Effective Time;

(ii)    any Liability under any Contract assumed by Buyer pursuant to Section 2.5(a) that arises after the Effective Time but that arises out of or relates to any Breach that occurred prior to the Effective Time;

(iii)   any Liability for Taxes, including (A) any Taxes arising as a result of Seller's operation of its business or ownership of the Acquired Assets prior to the Effective Time, and (B) any deferred Taxes of any nature;

(iv)   any Liability under any Contract not assumed by Buyer under Section 2.5(a), including any Liability arising out of or relating to Seller's credit facilities or any security interest related thereto;

(v)   any Environmental, Health and Safety Liabilities arising out of or relating to the operation of Seller's business or related to the leasing, ownership or operation of real property at any time prior to the Effective Time;

(vi)   any Liability accrued prior to Closing under the Employee Plans or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, except as provided in Section 2.5(a)(ix) and Section 2.1(p) above, and only to the extent that Seller's representations and warranties contained in Section 3.15(n) are false or inaccurate;

(vii)   any Liability under any employment, severance, retention or termination agreement with any employee of Seller or any of its Related Persons;

(viii)   any Liability arising out of or relating to any employee grievance whether or not the affected employees are hired by Buyer;

(ix)   any Liability of Seller to any Shareholder or Related Person of Seller or any Shareholder;

(x)   any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Seller;

(xi)   any Liability to distribute to any of Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(xii)   any Liability arising out of any Proceeding pending as of the Effective Time;

(xiii)   any Liability arising out of any Proceeding commenced after the Effective Time and arising out of or relating to any occurrence or event happening prior to the Effective Time;

(xiv)   any Liability arising out of or resulting from Seller's compliance or noncompliance with any Legal Requirement or Order of any Governmental Body;

(xv)   any Liability of Seller under this Agreement or any other document executed in connection with the Contemplated Transactions;

(xvi)   any Liability of Seller based upon Seller's acts or omissions occurring after the Effective Time;

(xvii)   any Liability for any monies borrowed by Seller or Shareholders;

(xviii)   any Liability for any failure, alleged failure, of Seller or Shareholders to comply with the WARN Act; and

(xix)   any Liability for performance under the contract relating to the yacht known as the "Ionian Princess," except that Buyer, at the Buyer's election in the Buyer's sole discretion, may choose after the Closing to assume the obligation for performance under the contract relating to the "Ionian Princess," in which case Seller will assign said contract to the Buyer.

(xx)   any Liability of Seller not expressly assumed herein.

## 2.6 ALLOCATION

The Purchase Price shall be allocated in accordance with Schedule 2.6. After the Closing, the parties shall make consistent use of the allocation, fair market value and useful lives specified in Schedule 2.6 for all Tax purposes and in all filings, declarations  and reports with the IRS in respect thereof.

## 2.7 CLOSING

The purchase and sale provided for in this Agreement (the "Closing") will take place at the offices of Seller's counsel Lee, Black, Hart & Rouse, commencing at 10:00 a.m. EST on March 4, 2003, unless Buyer and Seller otherwise agree.

{135774 1} 005867-000001
Mohamed – PJ APA 2-28-03 FINAL {135774.1}.doc

Subject to the provisions of Article 9, failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.7 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement. In such a situation, the Closing will occur as soon as practicable, subject to Article 9. Notwithstanding anything in this Agreement to the contrary, if Closing has not occurred by March 30, 2003, the parties shall not be obligated under this Agreement absent written agreement by all the parties to the contrary.

## 2.8 CLOSING OBLIGATIONS

In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

    (a)    Seller shall deliver to Buyer, together with funds sufficient to pay all Taxes necessary for the transfer, filing or recording thereof:

        (i)    a warranty bill of sale for all of the Acquired Assets that are Tangible Personal Property in the form of Schedule 2.8(a)(i) (the "Bill of Sale") executed by Seller;

        (ii)    an assignment of all of the Acquired Assets that are intangible personal property in the form of Schedule 2.8(a)(ii), which assignment shall also contain Buyer's undertaking and assumption of the Assumed Liabilities (the "Assignment and Assumption Agreement") executed by Seller;

        (iii)    for the lease interest in Real Property identified on Schedule 3.8, a Sublease and Indemnification Agreement in the form of Schedule 2.8(a)(iii) or such other appropriate document or instrument of transfer, as the case may require, each in form and substance satisfactory to Buyer and its counsel and executed by Seller;

        (iv)    RESERVED;

        (v)    such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Mohamed or Buyer, each in form and substance satisfactory to Mohamed or Buyer and its legal counsel and executed by Seller;

## GENERAL WARRANTY BILL OF SALE

This bill of sale is made by and between Palmer Johnson Savannah, Inc., a Wisconsin corporation licensed to do business in the State of Georgia (the "Seller") and Palmer Johnson Acquisition Corp., a Delaware corporation that owns 100% of the stock of Seller, and Andrew McKelvey, who owns 100% of the stock of Palmer Johnson Acquisition Corp. (collectively, "Shareholders"), in favor of Palmer Johnson Savannah, LLC, a limited liability company operating and existing under the laws of the State of Georgia (the "Buyer"), pursuant to that certain Asset Purchase Agreement by and among Seller, Shareholders, Buyer and Timur Mohamed dated as of February 28, 2003 (the "Asset Purchase Agreement"), and incorporated herein by this reference (any capitalized used in this bill of sale which is not expressly defined herein shall have the meaning ascribed to such term in the Asset Purchase Agreement). This bill of sale shall be effective as of the "Closing," as defined in the Asset Purchase Agreement (the "Effective Time").

Whereas, pursuant to the Asset Purchase Agreement, Seller has agreed to sell and assign to Buyer, and Buyer has agreed to purchase from Seller, the "Acquired Assets" as defined in the Asset Purchase Agreement, and this bill of sale is executed pursuant to, and to effectuate transactions contemplated by, said Asset Purchase Agreement.

For and in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Shareholders hereby grant, sells, conveys, transfers and assigns to Buyer good and marketable title in and to all of the "Acquired Assets."

The term Acquired Assets, as used herein, is defined in Section 2.1 of the Asset Purchase Agreement, except that Acquired Assets shall not include the "Excluded Assets" as defined in Section 2.3 of the Asset Purchase Agreement, and shall not include the "Retained Liabilities" as defined in Section 2.5(b) of the Asset Purchase Agreement.

To have and to hold the above-described property and Acquired Assets with all of the rights and privileges which Seller and Shareholders have to the Buyer, its successors and assigns, in fee simple and free and clear of all leases, mortgages, pledges, liens, security interests, conditional sales agreements, options, encumbrances, charges, and all other liabilities, restrictions, encumbrances and obligations of any nature whatsoever, except where specifically noted in the Asset Purchase Agreement.

And lastly, Seller and Shareholders, their successors and assigns, shall forever warrant and defend by virtue of these presents the Acquired Assets unto Buyer, its successors and assigns, against itself, its heirs, estates, legal representatives,

successors and assigns, and against the claims and demands of any and all other entities or persons whomsoever, and the undersigned each represents and warrants that he has the full power and authority to execute this bill of sale in the representative and/or individual capacity(ies) shown below. This instrument may be executed and delivered by facsimile transmission, and a facsimile copy of an executed copy shall be deemed and considered for all purposes as an executed original hereof, but in which case the undersigned shall immediately deliver the original to Buyer.

Executed under seal as follows:

Signed, sealed and delivered by said signatories in the presence of:

_____
Witness

_____
Notary Public

**NANCY ROONEY**
NOTARY PUBLIC, State of New York
No. 4873359
Qualified in Suffolk County
Term Expires Oct. 8, 20__ .

Palmer Johnson Savannah, Inc.

By: _____

Title: _____Sole Director_____

Attest: _____

Title: _____

{134588.1}  005867-000001
Mohamed - Close - PJ Bill of Sale {134588.1}.doc

2

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT ("Agreement") is made and entered into this 4th day of March, 2003, by and among Palmer Johnson Savannah, Inc., a Wisconsin corporation (the "Seller"), and Palmer Johnson Savannah, LLC, a limited liability company operating and existing under the laws of the State of Georgia (the "Buyer").

### WITNESSETH

WHEREAS, Seller and Buyer are parties to that certain Asset Purchase Agreement effective as of February 28, 2003 (the "Asset Purchase Agreement"), and the parties desire to enter into the following agreement with regard to the contracts assigned pursuant to the Asset Purchase Agreement;

NOW THEREFORE, in consideration of the promises and mutual covenants and agreements contained in this Agreement, the completion of the "Closing" (as defined in the Asset Purchase Agreement), and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

1.   Assigned Contracts: For purposes of this Agreement, "Seller Contracts" shall refer to all of the agreements contained in the Asset Purchase Agreement as Schedule 2.1(e), incorporated herein by reference.

2.   Assignment:  Seller does hereby assign to Buyer all of its rights, title, interest in, to and under the Seller Contracts as of the Closing.

3.   Assumption:  The Buyer hereby assumes and agrees to perform the Seller Contracts as of the Closing.

4.   Advice of Seller Contracts:  From and after the effective date of this Agreement, the parties shall completely and accurately respond to any request by the other party relating to the status of the Seller Contracts.

5.   Rights and Liabilities under Seller Contracts:  Buyer acknowledges and agrees that Seller assumes and only those rights and liabilities under the Seller Contracts that arise after the Closing.  Seller acknowledges and agrees that Buyer retains all of the rights and liabilities under the Seller Contracts that arise prior to the Closing.  Seller agrees to indemnify and hold harmless Buyer for any claims, losses, damages, suits, or actions arising out of the Seller Contracts prior to the Closing.

6.   Miscellaneous.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and will be governed by Georgia law. If any paragraph, section, sentence, or clause or phrase contained in this Agreement shall become or be adjudicated illegal, null or void for any reason whatsoever, the remaining paragraphs, sections, sentences, clauses or phrases contained in this Agreement shall not

Mohamed - PJ Assign and Assump {135805.1}.doc

{135805 1}  005867-000001

be affected thereby and shall remain valid and fully enforceable. All headings or captions for paragraphs or subparagraphs appearing herein are for the conveniences of the parties and shall not be used to construe or enforce any term or provisions hereof.

IN WITNESS WHEREOF, this Agreement has been executed and delivered by each of the parties hereto, all on the date first written above.

Palmer Johnson Savannah, LLC

By: _____

Its: _Manager_____

[remainder of page intentionally blank - signature page to follow]

Palmer Johnson Savannah, Inc.

By:

Its: _Sole Director_

## SUBLEASE AND INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT ("Agreement") is made and entered into this 4th day of March, 2003, by and between Palmer Johnson Savannah, Inc. ("Lessee"), Palmer Johnson Acquisition Corp., a Delaware corporation that owns 100% of the stock of Lessee, Andrew McKelvey, who owns 100% of the stock of Palmer Johnson Acquisition Corp. (collectively, "Shareholders"), Palmer Johnson Savannah, LLC, a limited liability company operating and existing under the laws of the State of Georgia (the "Sublessee"), and Timur Mohamed ("Mohamed").

### WITNESSETH

WHEREAS, the Lessee is party to a Net Lease Agreement dated March 31, 1992 with Thunderbolt Marine, Inc. (the "Lessor"), along with any amendments, schedules, and the Settlement Agreement dated as of May 17, 2002 related thereto (the "Lease Agreement");

WHEREAS, the parties have entered into an "Asset Purchase Agreement" on February 28, 2003 under which the Lessee is selling certain assets to the Sublessee;

WHEREAS, in conjunction with the Asset Purchase Agreement, the Lessee desire to sublease to the Sublessee, and the Sublessee desires to sublease from the Lessee, the Lease Agreement, subject to the terms and conditions herein;

NOW THEREFORE, in consideration of the promises and mutual covenants and agreements contained in this Agreement, the completion of the "Closing" (as defined in the Asset Purchase Agreement), and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

1.  Sublease: Lessee does hereby sublease to Sublessee all of its rights, title, interest in, to and under the Lease Agreement as of the Closing.

2.  Assumption: The Sublessee and Mohamed hereby assumes and agrees to perform the Lease Agreement, including the obligations under any amendment and the Settlement Agreement related thereto, as of the Closing.

3.  Rights and Liabilities under the Lease Agreement / Indemnification: The parties hereto acknowledge and agree that Sublessee and Mohamed assume only those rights and liabilities under the Lease Agreement that arise after the Closing. Sublessee and Mohamed shall indemnify, defend and hold harmless Lessee and Shareholders for any and all rental payments, and other payments due, under the Lease Agreement arising and accruing after the Closing. Sublessee and Mohamed agree to indemnify, defend and hold harmless McKelvey on McKelvey's personal guaranty to the Lessor under the Lease Agreement, for any liabilities under the Lease Agreement, including the obligations under any amendment and the Settlement Agreement related thereto, accruing after the Closing. This indemnification and duty to defend shall survive the termination of the Lease Agreement.

Lessee acknowledges and agrees that Lessee retains all of the rights and liabilities under the Lease Agreement that arise prior to the Closing. Lessee and and Palmer Johnson Acquisition, jointly and severally, agree to indemnify, defend and hold harmless Sublessee and Timur Mohamed for any and all claims, losses, damages, suits, or actions, including any claims by the Lessor, a third party, or a governmental entity, arising out of or related to the Lease Agreement prior to the Closing. This indemnification and duty to defend shall survive the termination of the Lease Agreement, and shall be supplemental to any indemnifications agreed to in the Asset Purchase Agreement, and shall not be interrupted to modify or replace any provisions of that Asset Purchase Agreement.

4.      <u>Miscellaneous</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and will be governed by Georgia law. If any paragraph, section, sentence, or clause or phrase contained in this Agreement shall become or be adjudicated illegal, null or void for any reason whatsoever, the remaining paragraphs, sections, sentences, clauses or phrases contained in this Agreement shall not be affected thereby and shall remain valid and fully enforceable. All headings or captions for paragraphs or subparagraphs appearing herein are for the conveniences of the parties and shall not be used to construe or enforce any term or provisions hereof. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

IN WITNESS WHEREOF, this Agreement has been executed and delivered by each of the parties hereto, all on the date first written above.

Palmer Johnson Savannah, Inc.

By: _____

Its: ____ Sole Director ____

Palmer Johnson Acquisition Corp.

By: _____

Its: ____ Chairman ____

Andrew McKelvey

_____

[signature page following]

Palmer Johnson Savannah, LLC

By: _____

Its: __Manager_____

Timur Mohamed

_____

## PROTOCOL OF DELIVERY AND ACCEPTANCE

Pursuant to that certain Asset Purchase Agreement dated as of February 28, 2003 (the "Asset Purchase Agreement") by and among Palmer Johnson Savannah, Inc., a Wisconsin corporation (the "Seller"), Palmer Johnson Acquisition Corp., a Delaware corporation that owns 100% of the stock of Seller, Andrew McKelvey, who owns 100% of the stock of Palmer Johnson Acquisition Corp. (collectively, AShareholders@), Palmer Johnson Savannah, LLC, a limited liability company operating and existing under the laws of the State of Georgia (the "Buyer"), and Timur Mohamed, the parties hereto acknowledge that the Closing, as defined in the Asset Purchase Agreement, occurred at 5:00 p.m. local time in Savannah, Georgia at the offices of Lee, Black, Hart & Rouse on the 4th day of March, 2003. The exchange of copies of this Protocol and the other documents relating to the Asset Purchase Agreement transaction, and of signature pages by facsimile transmission, shall constitute effective execution and delivery as to the parties and may be used in lieu of the original for all purposes. Signatures of the parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

Dated this 4th day of March, 2003.

PALMER JOHNSON ACQUISITION CORPORATION

Signature: _____

Print Name: _Andrew McKelvey_

Its: _Chairman_

[Remainder of page intentionally blank - signature pages to follow]

PALMER JOHNSON SAVANNAH, INC.

Signature: _____

Print Name: _Andrew McKelvey_____

Its: __Sole Director_____

[Remainder of page intentionally blank - signature pages to follow]

ANDREW MCKELVEY

Signature:

[Remainder of page intentionally blank - signature pages to follow]

PALMER JOHNSON SAVANNAH, LLC

Signature: _____

Print Name: _____

Its: _____

[Remainder of page intentionally blank - signature page to follow]

TIMUR MOHAMED

Signature: _____